[Cite as *State v. Lanier*, 2010-Ohio-6382.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.    09 MA 97 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | O P I N I O N |
| | ) | |
| ANTWON LANIER, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |


CHARACTER OF PROCEEDINGS:          Criminal Appeal from Common Pleas
                                                            Court, Case No. 06CR666.


JUDGMENT:                                        Affirmed.


APPEARANCES:
For Plaintiff-Appellee:                        Attorney Paul Gains
                                                            Prosecuting Attorney
                                                            Attorney Ralph Rivera
                                                            Assistant Prosecuting Attorney
                                                            21 West Boardman Street, 6th Floor
                                                            Youngstown, Ohio  44503


For Defendant-Appellant:                  Attorney Rhys Cartwright-Jones
                                                            47 North Phelps Street
                                                            Youngstown, Ohio  44503-1130


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated: December 22, 2010

VUKOVICH, P.J.

¶{1} Defendant-appellant Antwon Lanier appeals his conviction in the Mahoning County Common Pleas Court for rape, complicity to commit murder, complicity to commit kidnapping, and complicity to commit aggravated robbery.

¶{2} In the first assignment of error, Lanier argues that during closing argument the state improperly commented on his alleged post-arrest silence in violation of *Doyle v. Ohio* (1976), 426 U.S. 610. A review of the context in which the comments were made shows that they were not comments on post-arrest silence. Thus, there is no *Doyle* violation. Furthermore, even if they were comments on post-arrest silence, the testimony reveals that Lanier waived his *Miranda* rights and spoke to law enforcement authorities. The record does not indicate that he re-invoked his *Miranda* rights. Consequently, any *Doyle* violation would constitute harmless error, not reversible error.

¶{3} In the second assignment of error, Lanier argues that his constitutional right to confrontation was violated when the trial court permitted Cassie Johnson, a prior employee of the private DNA testing facility, Orchid Cellmark, to testify about the results of Y-STR testing (a type of DNA testing) that was done on the vaginal swab taken from Sierra Slaton, the victim, and samples taken from him and Antonio Jackson, his co-defendant. Lanier contends that Johnson was not the analyst who performed the Y-STR testing and thus, her testimony violates the confrontation clause and the decision announced by the United States Supreme Court in *Melendez-Diaz v. Massachusetts* (2009), 557 U.S. __, 129 S.Ct. 2527.

¶{4} A review of Johnson's testimony reveals that she did in fact testify that she performed the tests. As such, there is no violation of the confrontation clause and no violation of the *Melendez-Diaz* holding.

¶{5} In the third assignment of error, Lanier argues that the convictions are against the manifest weight of the evidence. Specifically, he contends that the state's primary witness, his co-defendant Antwain Blackmon, was not credible because

Blackmon has a motive for implicating Lanier and there are inconsistencies between his testimony and previous statements. He also contends that the convictions are against the manifest weight of the evidence because the Y-STR testing results are inadmissible.

¶{6} Credibility is best left to the trier of fact and when considering the testimony and the alleged inconsistencies it cannot be concluded that the jury lost its way in believing all or part of Blackmon's testimony. Furthermore, the results of the Y-STR testing are admissible. Thus, we find that the convictions are not against the manifest weight of the evidence.

¶{7} In his fourth assignment of error, Lanier makes a sufficiency argument. This argument concentrates solely on the rape conviction and contends that the state did not produce any admissible evidence to show the elements of the offense. Lanier's argument is premised on the belief that the Y-STR testing results are inadmissible.

¶{8} Despite Lanier's insistence to the contrary, as previously stated, the Y-STR testing results are admissible and provide evidence of rape. Likewise, Blackmon's testimony provides circumstantial evidence of rape and the medical examiner's testimony does not dispute that conclusion. Thus, the sufficiency argument is without merit.

¶{9} Lastly, Lanier argues that even if the above errors taken alone are not sufficient to reverse the convictions and remand for a new trial, the accumulation of those errors does warrant a new trial. This argument lacks merit. At most only one instance of harmless error could possibly be found. One instance of harmless error is not sufficient to find cumulative error. As such, there is no basis for cumulative error.

¶{10} Consequently, we find no merit with any of Lanier's arguments. For the reasons stated below, the judgment of the trial court is hereby affirmed.

<u>STATEMENT OF THE FACTS AND CASE</u>

¶{11} A six count indictment was issued against Lanier for crimes committed against Sierra Slaton. The first count was for aggravated murder in violation of R.C. 2903.01(A)(F). This count contained two specifications. The first was a R.C. 2929.04(A)(7) specification asserting that Lanier was the principal offender or that there was prior calculation and design. The second was a firearm specification in

violation of R.C. 2941.134(A).  The second count of the indictment was for aggravated murder committed during the commission of aggravated robbery, kidnapping and/or rape, a violation of RC. 2903.01(B)(F).  Like the first count, this count contained principal offender/prior calculation and design, and firearm specifications.  The third count of the indictment was for rape, a violation of R.C. 2907.02(A)(2), a first-degree felony.  The fourth and fifth counts were for first-degree felony kidnapping, violations of R.C. 2905.01(A)(2) and R.C. 2905.01(A)(3), respectively.  The sixth count was for aggravated robbery, a violation R.C. 2911.01(A)(1)(C), a first-degree felony.  Counts three through six contained firearm specifications in violation of R.C. 2941.145(A).

¶{12} At trial, the state's theory of the case was that the crimes committed against Slaton were the result of Lanier being upset with her boyfriend, Jason Baty.  A few days prior to Slaton's death, Baty, Lanier, Antonio Jackson and Antwain Blackmon went to Canton, Ohio.  While in Canton, Lanier and Baty had a disagreement about leaving; Lanier made direct threats against Baty.  (Tr. 158-159). When they returned to Youngstown, Baty informed Lanier that he did not want to be his friend and wanted to have nothing to do with him.  (Tr. 164).  Baty's cellular phone then went missing.

¶{13} On the day of the crimes, Lanier had Baty's cellular phone when Slaton called the phone looking for Baty.  (Tr. 112, 221).  Lanier told Slaton that Baty was with another woman and that he knew where Baty was at.  (Tr. 222, 225).  Later that night or the early hours of the next day, Slaton met up with Lanier, Jackson and Blackmon wanting to go to Baty's location.  (Tr. 112, 225).

¶{14} They all got in Slaton's car and headed toward the Red Room, a bar in Youngstown.  (Tr. 226). However, prior to getting there Jackson pointed a gun at her and told her to stop the car.  (Tr. 227).  He pulled her out of the car at the South Side Park and dragged her into the woods.  (Tr. 228-229).  After awhile Lanier went into the woods.  (Tr. 23).  Later, Jackson came out of the woods dragging a hysterical Slaton who was not fully dressed.  (Tr. 232).  Lanier was walking beside them.  (Tr. 233). Slaton was then put in the car, Blackmon drove to his aunt's house to get another gun and then drove to McKelvey Lake.  (Tr. 233-238).  During this ride, Slaton was begging for her life and said they did not have to kill her.  (Tr. 236).  In response to that, Lanier told Jackson that Jackson knew what he had to do and that it was too late.  (Tr. 236,

240). At the lake, Jackson got Slaton out of the car and dragged her down into an embankment. (Tr. 240-241). Blackmon then heard gunshots. When Jackson got back into the car, Lanier asked him if it was done. (Tr. 241). Blackmon testified that Jackson and Lanier had guns during the crimes, however, he testified that Lanier never displayed his gun. (Tr. 259).

¶{15} Slaton's body was found two days later in McKelvey Lake. (Tr. 121). The autopsy revealed that Slaton was shot in the head multiple times, shot in the abdomen once and shot in the thigh twice. (Tr. 479). A rape kit was performed and seminal fluid was present on the vaginal swab taken from Slaton's body. (Tr. 370, 419, 485). Y-STR testing (a type of DNA testing) on the vaginal swab and samples taken from Jackson and Lanier, excluded Jackson and his patrilineal line, but Lanier and his patrilineal line could not be excluded. (Tr. 61, 66).

¶{16} On counts one and two of the indictment, the jury found Lanier guilty of the lesser included offense of complicity in the commission of the offense of murder, a violation of R.C. 2903.02(B) and R.C. 2923.03. 05/29/09 J.E. Lanier was also found guilty of rape, both counts of complicity in the commission of the offense of kidnapping and complicity in the commission of the offense of aggravated robbery. 05/29/09 J.E. On all counts he was found not guilty of the gun specifications. He was sentenced to an aggregate sentence of fifty-five years to life; he received fifteen years to life on counts one and two, which merged together and tens years on each of the remaining guilty verdicts. 07/23/09 J.E.

## FIRST ASSIGNMENT OF ERROR

¶{17} "*MIRANDA*: THE PROSECUTION'S INQUIRY INTO MR. LANIER'S POST-ARREST SILENCE VIOLATED HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO REMAIN SILENT."

¶{18} The general rule is that a defendant's post-arrest silence cannot be used against him. *Doyle*, 426 U.S. 610. This is because "post-arrest silence is inherently ambiguous since the silence may reflect only the defendant's exercise of his constitutional right to remain silent. * * * Any comment which infers that the defendant is guilty because he remained silent subverts the guarantees afforded him by the Fifth Amendment of the Constitution of the United States." *State v. Williams* (1979), 64

Ohio App.2d 271, 276. Courts look upon any comment by a prosecutor on the post-arrest silence of a defendant with extreme disfavor because they raise an inference of guilt from the defendant's decision to remain silent. *State v. Thompson* (1987), 33 Ohio St.3d 1, 4; *State v. Rogers* (1987), 32 Ohio St.3d 70.

¶{19} While *Doyle* specifically prohibits comments on post-arrest silence during cross-examination, the Eleventh Appellate District has held that such comments are similarly damaging when espoused during closing arguments. *State v. McMillion*, 11th Dist. No. 2005-A-0016, 2006-Ohio-3229, ¶26.

¶{20} If a court finds a *Doyle* violation, it must then determine if the error is harmless under the test set forth under *Chapman v. California* (1967), 386 U.S. 18. *State v. Contreras*, 8th Dist. No. 89728, 2008-Ohio-1413, ¶33. To determine whether a prosecutor's conduct was harmless, we shall consider the extent of the comments, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting appellant's guilt. Id. at ¶34.

¶{21} Lanier alleges that in the state's final closing argument the state commented on his post-arrest silence four times. The first two alleged improper comments are emphasized in the following argument made by the state.

¶{22} "Ms. Frenchko [prosecutor]: You are able to consider that evidence [results of the Y-STR testing] in your deliberations. And we spoke about the burden. The state has the burden; **the defendant has rights. They have the right to subpoena witnesses**." (Tr. 680-681).

¶{23} At that point, Lanier objected and the court sustained the objection. The state proceeded to state the following:

¶{24} "Ms. Frenchko: They have the right to independent testing. So if the testing that was performed wasn't good enough, samples were retained for independent testing.

¶{25} "Mr. Yarwood [defense counsel]: Objection. Your Honor, may we have a side bar?

¶{26} "The Court: Yes.

**¶{27}** "WHEREUPON, a discussion was had among court and counsel off the record and out of the hearing of the jury and court reporter, after which the proceedings continued as follows:

**¶{28}** "Ms. Frenchko: Cassie Johnson told you that samples are retained for independent testing, and none was done. However, they want to argue against the YSTR [sic]. It's not discriminating. **It excludes people. Had it excluded Antwon Lanier, I'm certain they'd be up here saying, oh, it's the most reliable thing ever**.

**¶{29}** "Mr. Yarwood: Objection.

**¶{30}** "The Court: Overruled.

**¶{31}** "Ms. Frenchko: At that point it would be reliable because it would benefit them. And the YSTR [sic] testing was appropriate in this situation, because the DNA was degraded because of the water, because they took her to the lake and dumped her body in the water. And the testimony is evidence, and the fact that the eight loci testing shows that it was consistent with the defendant's DNA is not a coincidence. Look at it all together. Look at the big picture." (Tr. 681-682). (Emphasized portions are those contending to be improper comments on post-arrest silence).

**¶{32}** These comments, when taken in the context that they were made, are not comments on post-arrest silence. Typically a *Doyle* violation occurs when the defendant does not waive his *Miranda* rights and when he takes the stand at trial the prosecutor asks questions as to why the defendant did not tell anyone what happened before testifying. Another scenario may be that in its case in chief the prosecutor questions the officer about his interrogation of the defendant who had not waived *Miranda* and the fact that the defendant remained silent when accused of the crime. Then at closing argument, the prosecutor comments on the post-arrest silence to infer guilt. Here, the state was indicating that Lanier could have done his own testing and subpoenaed witnesses about the DNA testing. The state was simply responding to Lanier's closing argument, in which he asserted that the Y-STR test results were not evidence of the rape because it was a test of exclusion, not inclusion. (Tr. 666-670). We have recently explained that such comments do not implicate *Doyle* or constitute an inquiry into post-arrest silence:

¶{33} "Chaney additionally argues that the State further impermissibly inquired about his silence by bringing attention to the fact that Chaney had not requested access to the DNA evidence in order to perform his own tests.  As the State correctly points out, the State is permitted to make reference to a defendant's failure to offer particular evidence in support of its case, and such a reference does not constitute an inquiry into a defendant's post-arrest silence.  *State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, at ¶251; *State v. Collins,* 89 Ohio St.3d 524, 527-528; *State v. Williams* (1986), 23 Ohio St.3d 16, 20."  *State v. Chaney*, 7th Dist. No. 08MA171, 2010-Ohio-1312, ¶40. See, also, *State v. Pace* (Dec. 13, 1999), 5th Dist. No. 99CA28 (stating state's comment on the defense ability to subpoena witnesses was in direct response to defense's argument and was not misconduct).

¶{34} The last two alleged improper comments on post-arrest silence are emphasized in the following excerpt of the state's final closing argument:

¶{35} "Ms. Frenchko:  **To disregard, and in order to find the defendant not guilty, you would have to disbelieve Detective Kelty about what Antwon Lanier said, and that was a videotaped statement.  They certainly can cross examine him.  They certainly can play the inconsistent portion.  No Antwon never said that**.

¶{36} "Mr. Yarwood:  Objection. Ask that –

¶{37} "The Court:  The jury will disregard that last comment.

¶{38} "Mr. Yarwood:  Your Honor, if we may have a side bar?

¶{39} "WHEREUPON, a discussion was had among court and counsel off the record and out of the hearing of the jury and court reporter, after which the proceedings continued as follows:

¶{40} "Ms. Frenchko:  **Defense counsel can cross examine all witnesses. However, there was no cross examination regarding the defendant not making those statements**.

¶{41} "Mr. Yarwood:  Objection.

¶{42} "The Court:  Sustained.  They jury will disregard the last comment."  (Tr. 685-686).  (Emphasized portion is alleged by Lanier to be improper comments on post-arrest silence).

¶{43} The objection to these comments was on the basis that the court did not allow the entire interview Detective Kelty had with Lanier to be discussed. (Tr.691-694). During direct examination, the state asked Detective Kelty about his interrogation of Lanier. (Tr. 531-537). Detective Kelty stated that Lanier was read his *Miranda* rights and waived those rights. (Tr. 532). Detective Kelty testified that Lanier talked about his trip to Canton, Ohio, that he had seen Slaton on the night of her death, and that he had Baty's cellular phone and when Slaton called he convinced her that Baty was with another female. (Tr. 534-535). Lanier also told Detective Kelty that he, Jackson and Blackmon met up with Slaton that night. (Tr. 536). He denied having any sexual contact with Slaton. (Tr. 536-537). During cross-examination of Detective Kelty, Lanier wanted to discuss whether Detective Kelty asked Lanier if he had anything to do with the murder of Slaton and what Lanier answered. (Tr. 559). The trial court did not allow that testimony. However, Detective Kelty's testimony was proffered and during that proffer Detective Kelty acknowledged that he asked Lanier whether Lanier was involved in Slaton's death and Lanier denied any involvement. (Tr. 559).

¶{44} As with the first two statements, the last two statements are not comments on post-arrest silence. They are comments on Lanier's failure to cross-examine Detective Kelty on whether he denied his involvement in Slaton's rape and murder and whether Lanier denied telling Detective Kelty that he had Baty's cellular phone and met with Slaton on the night on her murder. Thus, there is no *Doyle* violation.

¶{45} That said, even if we assume for the sake of argument that the comments were comments on post-arrest silence, any error is harmless. Comments on post-arrest silence may not violate a defendant's Fifth Amendment rights when the defendant waived his *Miranda* rights. *Chaney*, supra, at ¶31, citing *State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2; *State v. Carter,* 7th Dist. No. 06MA187, 2009-Ohio-933; *State v. Kolb,* 7th Dist. No. 07MA80, 2008-Ohio-5048; *State v. Jenkins* (March 14, 2000), 7th Dist. No. 98-502 CA. Furthermore, when the trial record indicates that the defendant opened the door on the issue of his post-arrest, post- *Miranda* silence, the error can be waived. Chaney, supra, at ¶31. As shown above, the testimony reveals

that Lanier waived his *Miranda* rights and talked to Detective Kelty. The video of his interview, which was partially played for the jury, clearly indicates that he waived those rights. Despite Lanier's insistence to the contrary, neither the transcript, video or record discloses that he invoked or re-invoked his *Miranda* rights at any time. Furthermore, we note that at trial defense counsel did not make any argument that the comments were comments on post-arrest silence. Rather, defense counsel sought to have more of the interview discussed at trial. Consequently, considering those factors in this instance we do not find that even if the comment was a comment on post-arrest silence that it amounted to reversible error. This assignment of error lacks merit.

SECOND ASSIGNMENT OF ERROR

¶{46} "***CRAWFORD***: THE TRIAL COURT ERRED IN ALLOWING IN HEARSAY TESTIMONY OF AN EXAMINING TECHNICIAN, THROUGH DNA ANALYST, WHO DID NOT EXAMINE DNA SAMPLES PERSONALLY."

¶{47} In *Melendez-Diaz*, the United States Supreme Court was asked to determine whether a defendant's Sixth Amendment right to confrontation was violated when the state introduced analysts' affidavits indicating that the contraband seized from Melendez-Diaz was cocaine. The affidavits were introduced without the testimony of the analysts who authored them. Citing its prior decision, *Crawford v. Washington* (2004), 541 U.S. 36, the Court concluded that "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to 'be confronted with' the analysts at trial." *Melendez-Diaz*, 129 S.Ct. at 2532.

¶{48} At trial, Johnson, a forensic scientist from Orchid Cellmark, testified about the results of Y-STR testing performed on the vaginal swab taken from Slaton and DNA samples taken from Lanier and Jackson. Y-STR is a type of DNA testing that concentrates solely on the male DNA. (Tr. 58). It is an exclusion DNA type of testing; using Y-STR testing alone one can never uniquely identify a particular male because the exact same Y chromosome profile is passed down from father to son. (Tr. 57-58, 68). Thus, the results of the Y-STR testing either exclude the individual and any of his patrilineal relatives or cannot exclude the individual and any of his patrilineal

relatives. (Tr. 57-67). The vaginal swab taken from Slaton only produced a partial profile of eight locations. A full profile consists of seventeen locations. (Tr. 65). Given the partial sample, Johnson's testimony indicated that while Jackson could be excluded, Lanier could not. (Tr. 65-66).

¶{49} The Sixth Appellate District has applied the *Melendez-Diaz* holding to an analyst of DNA. *State v. Middlebrooks*, 6th Dist. No. L-08-1196, 2010-Ohio-2377, ¶16-21. However, in coming to the determination, the court noted that the Indiana Supreme Court has found that a lab supervisor that played a direct part in processing the test could testify as to the tests results without violating the defendant's right to confrontation. Id. at ¶20, citing *Pendergrass v. State* (Ind.2009), 913 N.E.2d 703. See, also, *State v. Lopez*, 186 Ohio App.3d 328, 2010-Ohio-732, ¶61.

¶{50} We agree with our sister district that the *Melendez-Diaz* holding is applicable to an analyst of DNA. The parties here dispute whether Johnson was the analyst or whether she was a supervisor. We do not need to reach a determination of whether a supervisor testifying as to the results of an analyst violates a defendant's right to confrontation under the *Melendez-Diaz* holding. The record in this instance shows that Johnson performed the test and, as such, was the analyst. She testified that she performed the test:

¶{51} "Q. Were you asked to perform YSTR [sic] testing in this case?

¶{52} "A. I was.

¶{53} "Q. Did you perform testing?

¶{54} "A. I did.

¶{55} "Q. And when performing testing, do you generate reports?

¶{56} "A. I do.

¶{57} "* * *

¶{58} "Q. I'm handing you what's been previously marked for identification purposes as State's Exhibit 53. Do you recognize that?

¶{59} "A. Yes. This appears to be a copy of the report that I issued in this case.

¶{60} "Q. And that of course is kept in the ordinary course of Orchid Cellmark's business?

¶{61} "A. Yes

¶{62} "Q. And you generated that report?

¶{63} "A. Yes, I did.

¶{64} "Q. What did you receive to do the YSTR [sic] testing in this case?

¶{65} "* * *

¶{66} "A. In this case I was asked to perform YSTR [sic] testing on a vaginal swab and compare it to known samples collected from Antonio Jackson and Antwon Lanier." (Tr. 59-60).

¶{67} It is acknowledged that prior to making these statements, Johnson indicated that she began with Orchid Cellmark as a DNA analyst and that over time she was promoted to the position of forensic supervisor. (Tr. 53). However, in her testimony she did not state that she was the forensic supervisor when the Y-STR testing was done on the Slaton and Lanier samples or that she only supervised the testing. Rather, her testimony indicates that she actually performed the testing. Furthermore, State's Exhibit 53 (which was introduced, but not admitted at trial) is a copy of her report on the Y-STR testing. That report is signed by her as the Forensic Analyst, not as a supervisor. Moreover, while defense counsel objected to her testimony, that objection was based on the chain of custody - not on whether she had performed the testing. In fact, from the side bar discussions, defense counsel acknowledges that she tested the evidence. (Tr. 45-46). Consequently, there is not a *Melendez-Diaz* violation; Lanier's right to confrontation was not violated. This assignment of error lacks merit.

THIRD ASSIGNMENT OF ERROR

¶{68} "**MANIFEST WEIGHT**: THE MANIFEST WEIGHT OF THE EVIDENCE SUPPORTED ACQUITTAL."

¶{69} In determining whether a verdict is against the manifest weight of the evidence, a court of appeals must review the entire record, weigh the evidence and all reasonable inferences, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins* (1997)*,* 78 Ohio St.3d 380, 387. "Weight of the evidence concerns 'the inclination of the *greater*

*amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" Id.

¶{70} A conviction will only be reversed as against the manifest weight of the evidence in exceptional circumstances. Id. at 387. This is so because the trier of fact is in a better position to determine credibility issues, since he personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Hill* (1996), 75 Ohio St.3d 195, 204; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231. This concept is so important that a unanimous appellate court is required to reverse on manifest weight grounds after a jury trial. *Thompkins,* supra, at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution.

¶{71} Lanier's assertion that the convictions are against the manifest weight of the evidence focus on the admissibility of the Y-STR testing results that was argued under the second assignment of error and Antwain Blackmon's testimony.

¶{72} Starting with the Y-STR test results, those results go to the weight of the rape conviction. However, as discussed under the second assignment of error, those test results are admissible. Thus, it cannot be concluded that inadmissible test results supported that conviction. Admittedly, as explained above, Y-STR testing cannot uniquely identify a particular male; rather, it is a test used to exclude individuals. Furthermore, the vaginal swab that was taken from Slaton only contained a partial sample. That partial profile was observed in the African-American population in six out of nine hundred eighty-five African-Americans. (Tr. 68). The jury was in the best position to determine the weight that the results carried and that decision will not be second guessed. *State v. Barnhart*, 7th Dist. No. 09JE15, 2010-Ohio-3282, ¶41.

¶{73} Concerning Blackmon's testimony, as Lanier correctly points out, he is the key witness for the state who implicates Lanier in the crimes. His testimony was central in proving murder, aggravated robbery, and kidnapping. It was also useful in placing Lanier with Slaton when the rape occurred. Blackmon was offered a deal by the state to testify against his co-defendants Jackson and Lanier. The basis of the manifest weight argument in this instance is not that Blackmon's testimony, if believed, could not prove the elements of the crimes, but rather that Blackmon is not a credible witness and the jury should not have believed him. Thus, the issue before this court is

whether it is abundantly clear that Blackmon's testimony could not be considered credible. During trial, Lanier tried to show incredibility by referencing to previous statements Blackmon made to police that were inconsistent with his trial testimony. Furthermore, Lanier also pointed to Blackmon's involvement in the crimes and that the deal Blackmon made with the state constituted good reasons to lie about Lanier's and his own involvement in the crimes.

¶{74} Lanier first focuses on the alleged discrepancies in Blackmon's May 12, 2006 statement to the police and his trial testimony concerning the amount of time he asserted that Lanier and Jackson were together in the woods with Slaton. During trial, Blackmon testified as to what he recalled happened and then later was questioned about statements he made in the May 12, 2006 statement. At trial, on direct examination, he testified that Jackson and Lanier were in the woods with Slaton for "about" twenty-five minutes to a half an hour. (T. 232). On cross-examination, Lanier pointed out that in the May 12, 2006 statement to police Blackmon stated that Lanier was gone from the car for "approximately" 10 minutes. (Tr. 263). Lanier was trying to show that at trial was the first time Blackmon claimed that Lanier was in the woods with Jackson and Slaton for thirty minutes. On redirect however, the state did show that in the May 12, 2006 statement, Blackmon also indicated that the amount of time was an approximate of twenty-five minutes. Part of the May 12, 2006 transcript was read into the record, which provided:

¶{75} "A. Yes. 'So by that time Antwon [Lanier] is like, what's taking him so long? Antwon goes down into the park, stays down there for about 20 to 25 minutes."

¶{76} "* * *

¶{77} "A. Yes. 'So you sit there for how long?

'I would say we sat there for about 15 minutes.

'And then Lanier gets out and tries to go find KP [Jackson].

'Yes.

'For what?

'Twenty, twenty-five minutes.'

¶{78} "* * *

¶{79} "Q. Now, you say 20, 25 minutes. Did you have a stopwatch?

¶{80} "A. No, I didn't have a watch on.

¶{81} "* * *

¶{82} "Q. And for about 25 minutes, is that an approximate?

¶{83} "A. Yes." (Tr. 328-330).

¶{84} Thus, while there are differences in the May 12, 2006 statement, in that statement Blackmon did state that Lanier was in the woods with Jackson and Slaton for **approximately** 25 minutes. The use of the word approximate shows that the statements are not inconsistent and, thus, Blackmon's trial testimony was not necessarily unbelievable. Furthermore, as stated above, credibility is best left to the trier of fact. *Hill*, supra, at 204; *DeHass*, supra, at 231.

¶{85} The next alleged discrepancy involved whether Jackson or Lanier had a .38 Smith & Wesson during the crimes. Blackmon's testimony at trial was that Lanier had a .38 Smith & Wesson handgun. Lanier alleges that in the May 12th statement Blackmon stated that Jackson, not Lanier, had the .38 Smith & Wesson handgun. The trial transcript, however, does not indicate that Blackmon stated in the May 12th statement that Jackson had the Smith & Wesson:

¶{86} "Q. Yeah. May 12th, 2006, at one point, okay, you indicate that KP [Jackson] had the .38 Smith & Wesson on his lap in the car; correct?

¶{87} "A. No.

¶{88} "Q. Okay. So if you saw that, it would refresh your recollection; right?

¶{89} "A. No." (Tr. 269-270).

¶{90} While the May 12th statement was introduced into evidence, it was never admitted. Rather, the state's transcript of it was withdrawn and the trial court refused to admit Lanier's transcript of it. (Tr. 592, 601). Furthermore, the video of that statement was not played for the jury. (Tr. 297). Thus, the evidence before the jury did not clearly indicate that the May 12th statement was inconsistent with the trial testimony. Furthermore, even if it could be found inconsistent, the jury found Lanier not guilty on all gun specifications. Thus, the possible inconsistency does not clearly weigh against all the other convictions. After all, a jury is free to believe all, part, or none of the testimony of each witness who appeared before them. *State v. Helman*,

7th Dist. No. 03CO55, 2004-Ohio-4867, ¶12, citing *State v. Long* (1998), 127 Ohio App.3d 328, 335.

¶{91} The next alleged inconsistency is that in his May 12th statement Blackmon stated that Lanier tried to stop what happened. (Tr. 299). At trial, however, he testified that Lanier did not try to stop the events. (Tr. 258). On redirect, he stated that after they left South Side Park, neither him nor Lanier said anything to help Slaton. (Tr. 325).

¶{92} From the testimony, it could be concluded that Lanier tried to stop the crime prior to the rape, but after the rape did nothing to stop the murder. As stated above, the jury was free to decide which portion of this testimony to believe and is in the best position to determine witness credibility.

¶{93} The last alleged inconsistency concerns whether Lanier asked Jackson if it was done after Jackson returned from McKelvey Lake. On direct, Blackmon testified he did. (Tr. 241). However, on cross examination when asked about the May 12th statement, Blackmon admitted that he did not mention to the police that Lanier said anything to the effect of "Is it done?" (Tr. 308-309). On redirect, he was asked again if Lanier asked Jackson if it was done and Blackmon responded that Lanier did ask that. (Tr. 332).

¶{94} This is not a clear inconsistency. Rather it is an omission. As with all the other alleged inconsistencies the jury was free to believe any, all or none of Blackmon's testimony. It was in the best position to determine Blackmon's credibility.

¶{95} The last two reasons why the convictions are allegedly against the manifest weight of the evidence concern the fact that Blackmon had a good reason to lie. It was Blackmon's rifle that was used to kill Slaton and he made a deal with the state to receive only ten years for his part in the crimes for testifying against his co-defendants. He also admitted that he had given different versions of the events to authorities. (Tr. 310).

¶{96} The jury was aware that the rifle used to kill Slaton belonged to Blackmon, but Blackmon also testified that while he owned the rifle it was commonly used by himself, Jackson and Lanier. (Tr. 268-269, 323). Likewise, the deal Blackmon made with the state was presented to the jury and it could determine how

that affected Blackmon's credibility. Furthermore, Blackmon explained why he had provided different versions of the events to authorities. He stated that Jackson and Lanier were still at large and he was worried. (Tr. 320-321). He then stated that the May 12th statement is consistent with what he testified from his own recollection. (Tr. 321).

¶{97} Considering all the above separately and taken together, it cannot be concluded that the verdicts were against the manifest weight of the evidence. The jury obviously found at least part of Blackmon's testimony credible, and we will not second-guess the jury's finding as to credibility except in the most egregious cases where it is abundantly clear that the jury has lost its way. *Barnhart*, 7th Dist. No. 09JE15, 2010-Ohio-3282, at ¶41. Given his testimony it cannot be said that it is abundantly clear that the jury lost its way when it considered any part of Blackmon's testimony credible. This assignment of error lacks merit; the convictions are not against the manifest weight of the evidence.

<u>FOURTH ASSIGNMENT OF ERROR</u>

¶{98} "**SUFFICIENCY**: THE STATE FAILED TO OFFER ADMISSIBLE EVIDENCE IN SUPPORT OF LANIER'S RAPE CONVICTION."

¶{99} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith* (1997), 80 Ohio St.3d 89, 113. In essence, sufficiency is a test of adequacy. *Thompkins*, 78 Ohio St.3d at 386. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Smith,* supra, at 113.

¶{100} As aforementioned, Lanier was found guilty of rape in violation of R.C. 2907.02(A)(2). This section provides:

¶{101} "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

¶{102} Blackmon testified that Jackson pulled Slaton out of the car at the South Side Park and dragged her into the woods. (Tr. 228-229). After about 35 minutes Lanier proceeded to go into the woods. (Tr. 230). Twenty-five to thirty minutes later Jackson came out of the woods dragging Slaton, who was not fully dressed and was hysterical. (Tr. 232). Lanier was walking beside them. (Tr. 232). Blackmon indicated that after discussing killing Slaton, she told them they did not have to do that to her. (Tr. 236). Lanier told her it was too late. (Tr. 236).

¶{103} Dr. Ohr, the Mahoning County Medical Examiner testifying as a substitute witness because he did not perform the autopsy, indicated that the autopsy report stated that the vaginal area appeared normal; there was no trauma to the vaginal area. (Tr. 501). However, he also testified that there is not always visible trauma to the vaginal tract because "the vaginal tact may be pliable" or "the body may have undergone decompositional changes where we simply can't tell whether there is trauma there or not." (Tr. 505). He indicated that the body was submerged in the water for approximately twenty-four hours. (Tr. 490). That affected the quality of the evidence collected because "water has the effect of washing away and degrading any evidence that would be on the body." (Tr. 485).

¶{104} Britton testified that seminal fluid was present on the vaginal swab taken from Slaton. (Tr. 419). Johnson avowed that she performed Y-STR testing on that swab and on a sample taken from Lanier. (Tr. 59-61). The test concluded that Lanier and his patrilineal relatives could not be excluded. (Tr. 66-67). It was concluded that in the African-American population the partial profile of male DNA obtained from the vaginal swab taken from Slaton and comparing it to the sample taken from Lanier, the partial profile would occur in six out of nine hundred eighty-five African-Americans. (Tr. 68).

¶{105} Out of the above testimony, the only testimony that is contended to be inadmissible is the results of the Y-STR testing. However, as was discussed under the second assignment of error, the Y-STR results were admissible.

¶{106} When considering this evidence together, the elements of the offense of rape were shown. The fact that she was half clothed being dragged out of the woods, that she was hysterical, that seminal fluid was found in her vaginal cavity and that

Lanier could not be excluded as the source of that fluid, supports the elements of rape. Furthermore, the medical examiner explained that while there was no apparent trauma to the vaginal cavity, trauma is not always present when a rape occurs and furthermore the fact that she was submerged in water may have affected the ability to see vaginal trauma. Admittedly, the Y-STR testing cannot uniquely identify Lanier as the source of the seminal fluid, however, the weight to be given to that test's results is left to the trier of fact. Under a sufficiency analysis the test satisfies the state's production of evidence requirement. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks* (1991), 61 Ohio St.3d 259. Thus, this assignment of error does not have any merit.

FIFTH ASSIGNMENT OF ERROR

¶{107} "**CUMULATIVE ERROR**: MULTIPLE INSTANCES OF ERROR, COMBINED, CAUSED REVERSIBLE ERROR IN MR. LANIER'S CASE."

¶{108} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Garner* (1995), 74 Ohio St.3d 49, 64. However, the doctrine of cumulative error is inapplicable when there is not multiple instances of harmless error or the alleged errors are nonexistent. *State v. Jones*, 7th Dist. Nos. 08JE20 and 08JE29, 2010-Ohio-2704, ¶130 citing *Garner*, supra, at 64.

¶{109} Based upon the resolution of the above assignments of error, the doctrine of cumulative error does not apply. Therefore, this assignment of error lacks merit.

CONCLUSION

¶{110} For the foregoing reasons, the judgment of the trial court is hereby affirmed.


Donofrio, J., concurs.
Waite, J., concurs.