[Cite as *State v. D.E.M.*, 2016-Ohio-5638.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-589 |
| | | (C.P.C. No. 13CR-3645) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| [D.E.M.], | : | |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on September 1, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee.

**On brief:** *Michael K. Allen & Associates*, *Michael K. Allen*, and *Bryan R. Perkins*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, D.E.M., from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of rape and kidnapping.

{¶ 2} On July 10, 2013, appellant was indicted on one count of rape, in violation of R.C. 2907.02, and one count of kidnapping, in violation of R.C. 2905.01. The indictment arose out of an alleged incident between appellant and a female family acquaintance, "N.C.," on February 6, 2013.

{¶ 3} The matter came for trial before a jury on April 28, 2015. The first witness for plaintiff-appellee, the State of Ohio, was the alleged victim, N.C., age 43. N.C. grew up

near Cincinnati, Ohio, and her parents adopted her when she was two weeks old.  N.C. attended The Ohio State University as a dance major, graduating with a degree in dance performance.

{¶ 4}  N.C.'s aunt and appellant began dating in 1993 or 1994, when N.C. was 22 or 23 years of age; N.C. first met appellant at that time.  Appellant subsequently married N.C.'s aunt.

{¶ 5}  In 2013, N.C. resided in an apartment located on West Sixth Avenue, Columbus.  Appellant sometimes gave N.C. money to help with her "cell phone or to buy some groceries or gas."  (Tr. Vol. II at 81.)  She viewed this gesture as "a family member helping out another family member." (Tr. Vol. II at 81.)   Appellant first provided her with money "approximately six to nine months previous to the attack."  (Tr. Vol. II at 81.)

{¶ 6}  N.C. described her relationship with appellant as "family and good friends." (Tr. Vol. II at 82.)  They "talked a lot on the phone," and N.C. would "visit with him on family functions, gatherings, holidays, weddings."  (Tr. Vol. II at 82.)  During summer 2012, N.C. had phone conversations with appellant "[s]everal times a month."  (Tr. Vol. II at 83.)  They would also text each other.

{¶ 7}  Beginning in fall 2012, appellant began "making innuendos, sexual innuendos."  (Tr. Vol. II at 84.)  He sent N.C. "a text message of a pornographic cartoon." (Tr. Vol. II at 85.)  Appellant also "tried to solicit [N.C.]" in exchange "for money."  (Tr. Vol. II at 85.)  In October 2012, appellant began sending N.C. individual letters "with money in it, suggesting a sexual relationship."  (Tr. Vol. II at 85.)  N.C. did not respond to those letters.

{¶ 8}  At trial, N.C. identified letters and photographs of text messages she received from appellant in 2012. N.C. identified state's exhibit No. 34 as a "pornographic text message" sent by appellant.  (Tr. Vol. II at 95.)  N.C. identified state's exhibit No. 28 as one of the letters she received from appellant.  The letter stated in part: "Hope this helps. You are a beautiful and intelligent woman who has taken a part of my soul.  I am obsessed with uniting our bodies.  Spent many sleepless nights dreaming of you rocking my world.  A moment of lust fulfilled a dream come true could all be granted by you."  (Tr. Vol. II at 88-89.)  N.C. identified state's exhibit No. 29 as another letter she received from appellant in which he wrote: "I still long for [you to] rock my world.  Our bodies joining in

a moment of sensual pleasure.  I want to feel our bodies entwined as one.  Yes, for my own selfish pleasure. You might enjoy it too if you would allow the possibility.  I know you deserve more and hope one day you find it.  Until then, your horny selfish friend."  (Tr. Vol. II at 90.)  N.C. viewed the letters as "inappropriate."  (Tr. Vol. II at 89.)

{¶ 9}  N.C. identified several other letters she received from appellant during this time period.  One of the letters stated: "Hope things are getting better for you.  Looking forward to seeing you.  Let's get naked and crazy.  Your horny selfish friend."  (Tr. Vol. II at 92.)  Another letter stated in part: "We could help each other so much if you would bend your rules a little.  F***ing me isn't the worst thing you could do.  A thousand dollars would * * * do a lot for you. Your horny selfish friend."  (Tr. Vol. II at 92.)  Regarding appellant's reference to "bend[ing] your rules a little," N.C. testified that she has "strict rules about not engaging in relations with married men, * * * violating any type of family structure."  (Tr. Vol. II at 92.)  On a prior occasion, N.C. communicated that rule to appellant.

{¶ 10} In December 2012, N.C. was "struggling" with financial issues.  (Tr. Vol. II at 97.)  She worked as an independent choreographer, as well as a teacher, but her income was often below the poverty level.

{¶ 11} On February 3, 2013, N.C. attended a family gathering at a restaurant in Grove City; appellant and his wife also attended that function.  On February 4, 2013, appellant phoned N.C. and "asked if maybe I'd be interested in having lunch with him on the 6th, on his birthday."  (Tr. Vol. II at 101.)  N.C. told appellant she "wasn't sure, that he should call [her] in the morning and [she would] let him know."  (Tr. Vol. II at 101.)

{¶ 12} On the morning of February 6, 2013, N.C. received a text from appellant that stated: "Good morning, [N.C.].  I should be there around 11:50 or 12 o'clock.  I hope you will greet me in nothing but a towel and a smile.  Want me to pick up anything?"  (Tr. Vol. II at 94.)  Earlier that morning, N.C. and a friend had purchased some gourmet cupcakes at a nearby store.

{¶ 13} Shortly before noon, N.C. was alone at her residence when appellant arrived.  Appellant was wearing camouflage clothing, and he was carrying a backpack and a case of beer.  N.C. greeted appellant at the door and teased him about wearing

camouflage.  They went to the kitchen and began talking.  Appellant indicated that his wife was at work, and that he had taken the day off from his job.

{¶ 14} Appellant and N.C. sat in the kitchen for approximately one hour; they drank beer and appellant ate several cupcakes.  N.C. planned on going to lunch with appellant, and she walked out of the kitchen area and went into the bathroom.

{¶ 15} As she emerged from the bathroom, N.C. was "spun around" by appellant, and he tied her hands behind her back with some type of cord.  (Tr. Vol. II at 122.)  Appellant took a blue bandana and gagged N.C.'s mouth, and she was "thrown over his shoulder."  (Tr. Vol. II at 122.)  Appellant took N.C. into the bedroom, and "deposited [her] sideways over the bed."  (Tr. Vol. II at 122.)  N.C. "repeatedly tried to spit out [the bandana] to scream."  (Tr. Vol. II at 124.)  N.C. was able to spit out the gag three times, but appellant would then "shove it back" into her mouth.  (Tr. Vol. II at 124.)   N.C. was "scream[ing], 'No. Stop. Help. Don't. No.' " (Tr. Vol. II at 125.)

{¶ 16} As N.C. was on the bed with her hands tied, appellant was on top of her.  Appellant took off N.C.'s sweatpants and leggings.  Appellant then "raped [her] with his penis."  (Tr. Vol. II at 128.)  N.C. testified that she did not consent to any of appellant's actions.  After the incident, appellant quickly left the residence.

{¶ 17} N.C. then "went into the kitchen [and] pulled out a Tupperware container because [she] knew [she] wouldn't be able to make it to the hospital without urinating, so [she] collected [her] urine sample in a Tupperware container in case they needed it for evidence."  (Tr. Vol. II at 132.)  N.C. then phoned her friend [C.C.], and "told him he needed to get there right away and that we needed to call 911."  (Tr. Vol. II at 133.)  N.C. "was in shock."  (Tr. Vol. II at 133.)  Police personnel arrived a short time later, and N.C. was transported to the hospital, where she consented to an examination.  When she first arrived at the hospital, N.C. did not want to speak to a detective because she was "tired and stressed."  (Tr. Vol. II at 137.)  Later, when she "wasn't as nervous" or "scared," N.C. talked with detectives about the incident.  (Tr. Vol. II at 138.)

{¶ 18} Two days after the incident, appellant phoned N.C. and apologized.  N.C. did not speak to appellant during the call, and she had no further communications with him.

{¶ 19} On cross-examination, N.C. testified that appellant visited her in spring 2011 "maybe one or two times without his wife." (Tr. Vol. III at 154.) Appellant would sometimes bring beer, and he would discuss his marriage. Appellant shared with N.C. that he had intimacy issues with his wife.

{¶ 20} During one of appellant's visits, he went into the bathroom and emerged a short time later wearing no clothing. N.C. described him as "hostile [and] resistant. He sat back down. He broke down. He cried. He sobbed." (Tr. Vol. III at 163.) N.C. "told him he needed to go put his clothes back on" and leave her residence. (Tr. Vol. III at 162.) N.C. described appellant's conduct as "disturbing" and "out of the ordinary." (Tr. Vol. III at 163.)

{¶ 21} When asked about text messages sent by appellant suggesting sexual innuendos, N.C. testified: "I told him no. I told him I wasn't interested. I told him he needed to work on his marriage. I told him to get therapy. I told him to get help." (Tr. Vol. III at 168.) N.C. denied that appellant had shown her a bandana or strips of cloth. Appellant did tell her "that he liked the idea of tying a person up sexually, not me." (Tr. Vol. III at 177.)

{¶ 22} Sarah Dunn, a clinical nurse manager in the emergency department at Grant Medical Center, is certified as a "Sexual Assault Nurse Examiner." (Tr. Vol. III at 222.) On February 6, 2013, Dunn performed an examination of N.C. at the hospital. N.C. "was very anxious and very tearful" when Dunn first observed her. (Tr. Vol. III at 226.) Dunn explained the rape kit procedure, and N.C. indicated "she wanted the kit completed." (Tr. Vol. III at 227.)

{¶ 23} N.C. informed Dunn that the incident took place at approximately 2:30 p.m. that day (February 6, 2013), that the individual involved in the assault was an acquaintance, and that there had been vaginal penetration. N.C. reported the assailant had put his mouth on her "face, neck, and breast." (Tr. Vol. III at 236.) N.C. also reported that her assailant had tied her wrists and placed a gag in her mouth. When asked whether a weapon had been involved, N.C. indicated she had "visualized a knife in his bag." (Tr. Vol. III at 237.)

{¶ 24} With respect to the events leading up to the assault, N.C. told Dunn: "He text[ed] saying he would be arriving around 11 a.m. He showed up at 12 p.m. He arrived

in the house around 12:05 with his backpack and beer. We said hello. I gave him a B-day cupcake." (Tr. Vol. III at 238.) N.C. further reported that they were "chatting in the kitchen, shared two beers. He tried to dance with me. He tried to grab me and kiss me. I said, 'Please don't.' I told him I had a cold and to stay away." (Tr. Vol. III at 238.) N.C. further told Dunn: "He forced me into the bedroom with my hands behind my back. * * * He bound me. I was fighting him. He was yanking at pants. He put a handkerchief or bandanna, something in my mouth. He was over me. I would scream. I knew he tried to put his penis in me, and I think he succeeded. I was trying not to suffocate. I don't remember. I'm just shutting down." (Tr. Vol. III at 238-39.) N.C. then "started crying and got very quiet. She did not want to talk." (Tr. Vol. III at 239.)

{¶ 25} Dunn identified photographs she took of N.C. at the time of the examination. Dunn noted bruises to N.C.'s left hand, left wrist, right wrist, right forearm, left knee, and left shin; N.C. also exhibited redness and swelling to the lower lip, as well as redness and abrasion under her tongue.

{¶ 26} Columbus Police Detective Michael Cameron was on duty the date of the event, and received a report of a sexual assault in the Grandview area. Detective Cameron drove to the emergency room of Grant Hospital and met with N.C. He described "a level of upset I don't think I had ever witnessed," stating that N.C. "was * * * speaking very quickly, very upset, extremely emotional. Frantic, I think would be a good way to put it." (Tr. Vol. III at 275.) The detective attempted to ask her questions, but she began stuttering and became frustrated.

{¶ 27} Based on the initial interview, Detective Cameron determined that "her uncle, [D.E.M.], was the individual that had attacked her, that she had been * * * forcibly moved to the bedroom, hands tied behind her back, a gag placed in her mouth, and she had been forcibly raped or penetrated by [D.E.M.]." (Tr. Vol. III at 281-82.) Detective Cameron conducted two follow-up interviews with N.C., and detectives collected evidence from her residence, including a blue bandana. On March 12, 2013, Detective Cameron interviewed appellant, and the detective also collected DNA evidence from appellant.

{¶ 28} On cross-examination, Detective Cameron stated that N.C. brought a blue bandana to one of the interviews. N.C. told the detective that appellant had left the bandana at her residence during a visit prior to the incident on February 6, 2013; she told

the detective that appellant had also brought cloth strips on a prior visit. Appellant shared with N.C. that he wanted to tie her up. N.C. became upset with appellant and "threw him out." (Tr. Vol. IV at 355.)

{¶ 29} Malorie Kulp, a forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI"), testified that she analyzed a rape kit submitted to BCI in connection with the case. Erika Jimenez, a forensic DNA analyst with BCI, prepared a DNA report based on analysis of the evidence submitted. Jimenez testified that the DNA profile with respect to the male specific testing resulted in a "single DNA profile consistent with [D.E.M.]." (Tr. Vol. IV at 415.)

{¶ 30} Appellant testified on his own behalf. Appellant, a resident of Williamsburg, Ohio, first met N.C. in 1995. In 1998, appellant married N.C.'s aunt. Over the years, appellant would see N.C. at "family affairs, holidays, family dinners, birthdays, or weddings." (Tr. Vol. IV at 439-40.) Appellant testified that his relationship with N.C. "progressed through some flirtatious talk, communication, first, at the family affairs and then later by telephone." (Tr. Vol. IV at 439.) He stated that N.C. "would flirt, sexual innuendos, teasing." (Tr. Vol. IV at 439.)

{¶ 31} In 2010, they "started communicating by telephone. She would call me, or I would call her." (Tr. Vol. IV at 440.) At first, they "mainly just talked about family, life in general." (Tr. Vol. IV at 441.) In 2011, N.C. would call late at night, after appellant's wife went to sleep. During one phone conversation, appellant told N.C. that he and his wife were "having a few sexual problems * * * in the bedroom." (Tr. Vol. IV at 442.) During that conversation, appellant "just blurted it out that my sex life wasn't what I wanted." (Tr. Vol. IV at 442.)

{¶ 32} Appellant and N.C. also texted each other. In 2011, appellant began traveling to Columbus alone to visit N.C. In spring 2011, appellant "brought a 12-pack of beer" to N.C.'s residence. (Tr. Vol. IV at 446.) He "knocked on the door. She opens the door. She greets me with a hug and a kiss." (Tr. Vol. IV at 446.) During that first visit, appellant "stayed for a couple hours. We drank probably four, maybe five beers apiece. We just talked and laughed and joked." (Tr. Vol. IV at 447.)

{¶ 33} Over the next year, their phone conversations "had gotten to a more personal level. We would talk about money, sex, as well as family things too. We'd keep

each other caught up a little bit on family values or family functions * * * but she got to where she was starting to ask me for money." (Tr. Vol. IV at 448.) Appellant testified that "at some point * * * I asked, 'Well, what's in it for me?' as far as giving her money." (Tr. Vol. IV at 448-49.) According to appellant, N.C. asked him what he wanted and appellant responded: " 'Well, actually I'd like to get laid.' So I asked for sex." (Tr. Vol. IV at 449.)

{¶ 34} In spring 2012, appellant made a second trip to visit N.C.; appellant testified that "[s]he greeted me about the same way as usual, only this time when she gave me a kiss, it was a kiss on the lips. It was a little more affectionate." (Tr. Vol. IV at 449.) As they sat on the sofa in the living room drinking beer, N.C. "kind of comes over and just sits on my lap. She gives me a French kiss." (Tr. Vol. IV at 450.) Appellant testified that N.C. led him to the bedroom and "pulled up her sweatshirt" and allowed him to kiss her breasts. N.C. then "pulls her shirt back down and goes, 'That's enough.' " (Tr. Vol. IV at 451-52.) Appellant gave her $200 that day before he left.

{¶ 35} Their conversations became more personal. Appellant testified: "I knew she was having a hard time making ends meet. At the same time, I kind of felt like I needed to be a little bit rewarded if I would give her money, so I'd say, 'Well, if I give you money, what am I going to get?' I said, 'I'm wanting sex. You're wanting money; I'm wanting sex.' " (Tr. Vol. IV at 453.)

{¶ 36} During a visit by appellant in summer 2012, N.C. opened the door and "she's standing there in nothing but a towel." (Tr. Vol. IV at 455.) After they had a few beers, N.C. "tells me she has to go teach a dance class. She asked me if I will take her to her dance class. I said, 'Sure.' She got up and went and got dressed. I watched her * * * while she was dressing." (Tr. Vol. IV at 460.)

{¶ 37} Around this time, appellant made an appointment with "the Ohio Male Clinic." (Tr. Vol. IV at 462.) The physicians at the clinic informed appellant that he had "erectile dysfunction and abnormally low testosterone levels." (Tr. Vol. IV at 462.)

{¶ 38} In late summer or early fall 2012, appellant made another visit to see N.C. They sat down on the sofa and began talking. Appellant "didn't tell her * * * at the time" about his erectile dysfunction, but he "finally offered $500 for her to have sex with [him]." (Tr. Vol. IV at 463.) N.C. declined the offer. After they drank more beer, N.C. "kind of takes me by the hand and leads me out of the living room back to her bedroom." (Tr. Vol.

IV at 469.)   According to appellant, N.C. permitted him to perform oral sex on her for a brief period; N.C. then "says, 'That's enough,' again, at which time, I quit. She got up off the bed. We go back out, laughing about it a little bit.  I'm a little disappointed about it but still joking about it because things are moving along a little bit the way I'm seeing it."  (Tr. Vol. IV at 469-70.)  Appellant gave N.C. $300 during that visit.

{¶ 39}  Appellant visited N.C. again in late fall/early winter 2012.  During the visit, appellant excused himself to go to the bathroom.  He later emerged from the bathroom naked and sat down in a chair in the dining area for about one hour.  Appellant testified: "After that I get up, after I had been sitting there and talking and thinking, this ain't really one of my brightest ideas.  I wasn't in the best shape.  I was * * * kind of flabby.  I think, big mistake.  I get up.  I go back to the bathroom and put my clothes back on."  (Tr. Vol. IV at 475.)  He gave N.C. $200 on this visit.

{¶ 40}  During one of their phone conversations, N.C. asked appellant "if I had ever tied up my wife for sexual reasons, and I stipulated, no, that I thought that would be a little too kinky for my wife to go along with, and I had never thought about it.  And it was suggested that maybe [N.C.] and I might try that sometime."  (Tr. Vol. IV at 480.)

{¶ 41}  In January 2013, appellant visited N.C. again, bringing beer and a backpack. Inside the backpack, appellant had "a bandanna and some pieces of a T-shirt that I had made strips out of."  (Tr. Vol. IV at 481.)  Toward the end of his visit, appellant "pulled out these strips of my T-shirt.  She was looking at them, and she reached out and took ahold of a couple of them.  She actually pulled them and stretched them.  She goes, 'These won't hold me.'  I'm thinking, I don't really understand, but I show her the bandanna.  She looks at the bandanna and goes, 'This will do.' "  (Tr. Vol. IV at 483.)  Appellant "left her a couple hundred dollars that day."  (Tr. Vol. IV at 483.)

{¶ 42}  In early February 2013, appellant and his wife met N.C. and other family members at a restaurant in Columbus to celebrate N.C.'s birthday.  Appellant's birthday was later that week and appellant and N.C. "made plans for me to come up Wednesday." (Tr. Vol. IV at 486.)

{¶ 43}  Appellant gave the following testimony regarding the events of February 6, 2013.  Appellant's birthday was on that date, and he decided not to go to work.  Appellant told his wife he was "going to go to the casino and take a couple hundred dollars to see if I

could have any luck at the casino."  (Tr. Vol. IV at 487.)  Appellant was wearing blue jeans and a camouflage T-shirt.

{¶ 44} Appellant texted N.C. to inform her that he was coming to see her that day. On the drive to Columbus, appellant stopped at a store for beer and cigarettes.  He also had "a pint of moonshine * * * and a joint." (Tr. Vol. IV at 491.)  Because it was his birthday, appellant "figure[d] * * * we're going to celebrate. We're going to fool around." (Tr. Vol. IV at 491.)

{¶ 45} N.C. greeted appellant at the door.  They started drinking beer in the kitchen, and appellant ate some cupcakes.  Appellant brought three bandanas with him that day.  N.C. asked appellant "to get the * * * bandannas."  (Tr. Vol. IV at 495.) According to appellant, N.C. took him by the hand and led him toward the bedroom.  N.C. "goes over there by the bed.  She unzips her top all the way down, exposes her front side." (Tr. Vol. IV at 496.)

{¶ 46} Appellant "walked over to her.  I had my bandannas. When I get about to her, she spins around and puts her hands behind her back."  (Tr. Vol. IV at 496.) Appellant took a bandana and tied her hands, and N.C. then "turned back around and just kind of fell back on the bed." (Tr. Vol. IV at 497.)  Appellant began kissing "the upper part of her body," and he eventually "removed her sweatpants."  (Tr. Vol. IV at 497.) According to appellant, he was "instructed that I needed to gag her after I had removed her sweatpants."  (Tr. Vol. IV at 497.)  He "was gagging her with a blue bandanna."  (Tr. Vol. IV at 497.)

{¶ 47} Appellant then took off his clothing.  Appellant testified that he was unable to have intercourse with N.C. because he "ejaculate[d] pretty much all over her, the bed, everywhere."  (Tr. Vol. IV at 502.)  Appellant was "disappointed," knowing that "the chance of having intercourse was no longer there."  (Tr. Vol. IV at 503.)  Appellant testified that he was "frustrated. I jump up and say, 'All right. This is done. I'm done. We're done. We're through here.' "  (Tr. Vol. IV at 503.)  He untied her hands and removed the gag.

{¶ 48} According to appellant, N.C. "was wanting her money.  She was wanting a thousand dollars for the intercourse, which is what we had agreed upon before.  I'm still putting my clothes on.  I told her, I said, 'We didn't have intercourse.  I'm not paying you a

thousand dollars.' "  (Tr. Vol. IV at 503-04.)  Appellant and N.C. continued to argue, and appellant "got two $50 bills out, and basically I threw them at her."  (Tr. Vol. IV at 504.)

{¶ 49} Following the incident, Detective Cameron contacted appellant, and appellant and his wife subsequently drove to Columbus to speak with the detective. During the drive, appellant told his wife some of the details of his relationship with N.C., but he did not tell her everything.  Rather, he "just told [his wife] we had been seeing each other, and I'd been basically sneaking up to Columbus to see her."  (Tr. Vol. IV at 510.)

{¶ 50} Appellant and his wife met Detective Cameron at Columbus Police Headquarters.  Appellant testified that he "started a statement that day."  (Tr. Vol. IV at 513.)  According to appellant, he had watched the television show "SVU," and knew that "[w]hen they interview people, a lot of times, somebody is outside watching.  I thought my wife would be able to see what was being said, and I wasn't going to throw all the dirty details about the affair out to them in front of her."  (Tr. Vol. IV at 513.)  Appellant "wanted to tell her all the dirty little details."  (Tr. Vol. IV at 513.)  Appellant acknowledged that he "lied to the police" during the interview.  (Tr. Vol. IV at 518.)  He "never told [the detectives] about bringing bandannas to tie [N.C.] up."  (Tr. Vol. IV at 518.)  Appellant did not keep N.C.'s text messages out of fear that his wife might read them.

{¶ 51} During cross-examination, appellant acknowledged lying to detectives when questioned about letters he had written to N.C.  He also told detectives he did not tie N.C.'s hands behind her back or gag her.  Appellant also recalled telling detectives that he penetrated N.C.'s vagina about an inch or two.

{¶ 52} Following the presentation of evidence, the jury returned verdicts finding appellant guilty of both counts.  The trial court conducted a sentencing hearing on May 18, 2015.  By entry filed May 20, 2015, the court sentenced appellant to ten years incarceration on each count, with sentences to run concurrent to each other.

{¶ 53} On appeal, appellant sets forth the following 11 assignments of error for this court's review:

> ASSIGNMENT OF ERROR NO. 1:
>
> THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY DENYING HIS REQUEST FOR A CONTINUANCE OF THE TRIAL DATE.

ASSIGNMENT OF ERROR NO. 2:

THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPEL[L]ANT BY PERMITTING REPEATED INSTANCES OF PROSECUTORIAL MISCONDUCT WHICH DEPRIVED DEFENDANT-APPELLANT OF HIS RIGHT TO A FAIR TRIAL.

ASSIGNMENT OF ERROR NO. 3:

THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY FAILING TO GRANT A MISTRIAL.

ASSIGNMENT OF ERROR NO. 4:

THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AS HIS CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL.

ASSIGNMENT OF ERROR NO. 5:

THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AND VIOLATED HIS FEDERAL AND STATE DUE PROCESS RIGHTS BECAUSE HIS CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

ASSIGNMENT OF ERROR NO. 6:

THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY ADMITTING IMPER-MISSIBLE HEARSAY EVIDENCE.

ASSIGNMENT OF ERROR NO. 7:

THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY FAILING TO PROPERLY INSTRUCT THE JURY.

ASSIGNMENT OF ERROR NO. 8:

THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY FAILING TO MERGE ALLIED OFFENSES OF SIMILAR IMPORT.

ASSIGNMENT OF ERROR NO. 9:

THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY IMPOSING A TEN YEAR PRISON SENTENCE.

ASSIGNMENT OF ERROR NO. 10:

DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL SECURED TO HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

ASSIGNMENT OF ERROR NO. 11:

THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT AS THE CUMULATIVE EFFECT OF ERRORS AT THIS TRIAL DENIED HIM OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW.

{¶ 54} Under his first assignment of error, appellant asserts the trial court erred in denying his request for a continuance of the trial date in order to obtain mental health records of the alleged victim. Appellant, noting that the credibility of N.C. was critical to his defense, argues that the trial court's decision not to grant the continuance denied him the right to present a complete and meaningful defense.

{¶ 55} By way of background, during a proceeding conducted by the court on the afternoon of April 27, 2015, the day before trial commenced, counsel for appellant noted that the "indictment alleges basically two things: One, he purposely compelled the alleged victim by force or threat of force, but it's also charged in the and/or that he * * * had reasonable cause to believe that her ability to resist or consent was substantially impaired because of a mental or physical condition or because of advanced age." (Tr. Vol. I at 7.) Appellant's counsel expressed his understanding that the state had elected to "proceed on force or threat of force; otherwise, there would have been obligations to produce or to have hearings about her mental condition." (Tr. Vol. I at 7.) Counsel further stated: "I think we did talk about it at one point in one of the continuances before. I am bringing that up now, and I would just ask that we not discuss the mental condition part of the indictment." *Id.* In response, the prosecutor stated: "[I]t's my opinion that the evidence is not going to show that she was drunk or substantially impaired by drugs or was given

anything that would have affected her mental ability, and so the State is not proceeding on that theory." (Tr. Vol. I at 8.)

{¶ 56} Following further discussion, including an off-the-record conversation between defense counsel and his co-counsel, the defense requested a continuance and "a Court-ordered subpoena for the alleged victim's mental health records at North Central Mental Health facility or whatever it is." (Tr. Vol. I at 15.) Appellant's counsel represented that he "was trying to head this problem off," but "[f]or one reason or another * * * didn't think it through completely." (Tr. Vol. I at 16.) Counsel further stated: "I thought that everybody was on the same page, but this has dawned on me now at the 11th hour, and I just want the extra time to follow up with this." (Tr. Vol. I at 16.)

{¶ 57} In addressing the defense's motion for a continuance, the prosecutor stated:

> This would be, Your Honor, an effort to basically delve into what's otherwise not discoverable material of the victim that we have. If the defense puts on a consent defense and raises the issue about consent or ability to consent or mental health or physical condition, it's at the time of the offense. I mean, the Court needs to look at that. So I don't know what -- if there are mental health history records of a psychiatrist -- and I assume they would precede this incident -- I don't know that those are necessarily relevant to her ability at the time of the offense to consent or not.
>
> It seems the defense is trying to bootstrap their attack on the victim's credibility by introducing or having access to her mental health history, which I think is one of the most closely guarded things an individual should have.
>
> The State has no expert witnesses. I've not intended to put forth in my direct any mental health history or any fact based on my interviews with the victim that she was under the influence of any drugs, as I mentioned, and that she was, otherwise, mentally stable at the time. That will not be my line of questioning on my direct, Your Honor.

(Tr. Vol. I at 17.)

{¶ 58} The prosecutor further represented that the state had not subpoenaed any health records pertaining to the victim. The prosecutor also argued it would create a hardship to continue the case, noting that the state had scheduled BCI scientists and medical personnel to testify the next day.

{¶ 59} Following the above discussions, the trial court denied the motion, ruling in part: "We are not going to go into the issue. If we run into it, I will sidebar it immediately, and we'll figure out what we're going to do." (Tr. Vol. I at 21.)

{¶ 60} Under Ohio law, "[t]he grant or denial of a continuance is a matter [that] is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). There is "no mechanical test for determining when a trial court's denial of a continuance motion is so arbitrary as to violate due process; rather, each case must be decided on its own particular circumstances." *State v. Richardson,* 6th Dist. No. L-83-360 (Mar. 9, 1984), citing *State v. Sowders,* 4 Ohio St.3d 143, 144 (1983.) In evaluating a motion for a continuance, a trial court can consider several factors, including "the length of delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors." *State v. Landrum,* 53 Ohio St.3d 107, 115 (1990).

{¶ 61} Appellant maintains there was a good-faith basis to request N.C.'s mental health records in light of information indicating she had received treatment at a mental health facility; according to appellant, the fact N.C. suffered some type of mental health issue would have been valuable impeachment material. Appellant relies on a federal decision for the proposition that "certain forms of mental disorder have high probative value on the issue of credibility." *United States v. Lindstrom,* 698 F.2d 1154, 1160 (11th Cir.1983).

{¶ 62} In arguing potential prejudice, appellant points to an admission by N.C. during trial that she was not taking a prescribed medication at the time of the incident. Appellant contends it is likely that N.C.'s mental condition, as well as her failure to take her medication, may have detrimentally impacted her ability to perceive or truthfully recount the events. Appellant also raises a confrontation argument, asserting the court prevented him from presenting a complete and meaningful defense by not granting the continuance.

{¶ 63} In response, the state argues that the defense provided no information regarding the content of the records at issue, or what it hoped to establish through their admission. The state further argues there was no indication whether such records, even if

they did exist, would have been admissible or subject to the protection of a privilege. The state, noting that the case had been pending for almost 22 months and that the trial court had already granted 11 continuances, argues that no evidence of a mental condition was ultimately presented at trial or inquired about.

{¶ 64} Based on this court's review, we find no abuse of discretion by the trial court in denying the motion for a continuance. As noted above, during a discussion before the court on the day before trial, defense counsel raised concerns as to the possibility of the state pursuing a theory of the case which included the elements of rape under R.C. 2907.02(A)(1)(c) (i.e., "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition"). In response, the state indicated "the evidence is not going to show that she was * * * given anything that would have affected her mental ability, and so the State is not proceeding on that theory." (Tr. Vol. I at 8.) Rather, the state represented that it was proceeding on a theory of forcible rape as defined under R.C. 2907.02(A)(2). We note, as part of that discussion, defense counsel informed the trial court that their theory of the case was "[c]onsent." (Tr. Vol. I at 8.)

{¶ 65} Here, defense counsel acknowledged that the request for a continuance was at the "11th hour," and the reasons advanced by counsel for seeking the continuance were "just want[ing] the extra time to follow up with this." (Tr. Vol. I at 16.) Counsel for appellant also recognized that "there's been no expert opinion that her ability mentally to consent was impaired at all by a mental defect or any other way." (Tr. Vol. I at 9.)

{¶ 66} Further, defense counsel did not proffer any facts with respect to what evidence might be contained in the records, and there is no indication that the records would have provided the defense any meaningful impeachment evidence; nor is it clear, as argued by the state, whether such records would have even been admissible. With respect to a statement by N.C. that she was not taking a prescribed medication, the record supports the state's argument that the reference to a particular medication was unexplained and not linked to any purported mental condition at the time of the events. As also noted by the state, the trial court had already granted a number of continuances of

the original trial date, and counsel for appellant did not indicate how much time the defense might need to secure any potentially admissible mental heath records.

{¶ 67} We do not find dispositive appellant's reliance on *Lindstrom*, a federal decision in which the Eleventh Circuit Court of Appeals held that the district court erroneously restricted cross-examination and defense access to documents pertaining to the psychiatric history of one of the government's witness. Under the facts of that case, defense counsel had proffered medical records indicating that the witness had been diagnosed as suffering from pseudo-neurotic schizophrenia at the time of the relevant events, "which caused her to misperceive and misinterpret the words and actions of others, and which might seriously affect her ability 'to know, comprehend and relate the truth.' " *Id.* at 1166. As indicated above, there was no evidence in the instant case that N.C. suffered from a mental illness at the time of the events, nor does this case involve a claim that the trial court restricted cross-examination of the witness.

{¶ 68} Nor do we find that the trial court's denial of appellant's request for a continuance gave rise to a Confrontation Clause violation. As noted, the trial court, in denying the motion, held that if the issue of N.C.'s mental health arose at trial, the court would deal with the matter at sidebar. However, the issue of mental impairment at the time of the incident did not arise at trial, and N.C. was subject to cross-examination.

{¶ 69} Based on the record on appeal, the trial court did not abuse its discretion in denying the motion for a continuance, and appellant's first assignment of error is overruled.

{¶ 70} Appellant's second and third assignments of error are interrelated and will be considered together. Under his second assignment of error, appellant asserts the trial court erred in allowing repeated instances of prosecutorial misconduct, depriving him of the right to a fair trial. Specifically, appellant argues the prosecutor engaged in misconduct during opening statement and closing argument, as well as during cross-examination of appellant. Under his third assignment of error, appellant argues the trial court erred in failing to grant a mistrial based on the prosecutor's purported misconduct during cross-examination of appellant.

{¶ 71} Under Ohio law, "[t]he test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial." *State v. Fears,* 86 Ohio

St.3d 329, 332 (1999), citing *State v. Apanovitch*, 33 Ohio St.3d 19, 24 (1987). In order to address such a claim, "we must determine (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected [the defendant's] substantial rights." *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 121, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). Further, "[t]he touchstone of this analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). A reviewing court "will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *Id.*, citing *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001).

{¶ 72} Appellant first contends the prosecutor engaged in misconduct during opening statement by stating to the jury that the state's evidence of sexual conduct was overwhelming, and that the only possible response to such evidence could be a claim that the encounter was consensual. According to appellant, this argument exceeded the permissible bounds of opening statement and served to improperly shift the burden of proof onto appellant to prove a defense.

{¶ 73} In response, the state argues that the statement at issue constituted a legitimate preview of what the evidence would show and the type of case the jury would be dealing with, i.e., a defense claiming consent. The state notes that, prior to the prosecutor's comment, defense counsel had informed the trial court that their theory of the case was consent, and the state argues the defense had also already informed the jury as much during voir dire.

{¶ 74} A review of the record indicates that the prosecutor, during opening statement, stated to the jury that "the evidence is so overwhelming that it can't be but [D.E.M.] that had vaginal intercourse with [N.C.]." (Tr. Vol. II at 50.) The prosecutor further stated: "I can give you a preview right now * * * that [D.E.M.] had vaginal sex with [N.C.], engaged in sexual conduct against her will with force, the threat of force, and restrained her while doing so. There's really only one thing that you can say in response to that was it * * * consensual." (Tr. Vol. II at 50.)

{¶ 75} At the outset, we note that appellant failed to object to the above statement. Under Ohio law, "[f]ailure to object to the alleged misconduct of the prosecutor at trial

means that an appellant will have waived all but plain error." *State v. Bickley,* 6th Dist. No. E-09-024, 2010-Ohio-1480, ¶ 23, citing *State v. Jones*, 91 Ohio St.3d 335, 352 (2001). Furthermore, " '[p]lain error does not exist unless, but for the improper comments of the prosecutor, the outcome of defendant's trial would clearly have been different; that is, he would not have been convicted.' " *Bickley* at ¶ 23, quoting *State v. Pillow*, 2d Dist. No. 07CA095, 2008-Ohio-6046, ¶ 48.

{¶ 76} Upon review, appellant has not demonstrated plain error. In general, "the purpose of an opening statement is to acquaint the jury with the general nature of the case and to outline the facts which counsel expects the evidence to show." *State v. Hamilton,* 12th Dist. No. CA2001-04-044 (Feb. 11, 2002), citing *Maggio v. Cleveland*, 151 Ohio St. 136, 140 (1949).

{¶ 77} Here, the prosecutor's comment appears to have anticipated that the defense would proceed under a theory of consent, which it did, and we find no misconduct under these circumstances. *See State v. Boeddeker,* 12th Dist. No. CA2009-05-029, 2010-Ohio-106, ¶ 15 (defendant failed to show prejudice as a result of prosecutor's opening statement that made reference to what defense would try to prove as prosecutor was "referencing what strategy [defendant's] trial counsel had already made reference to during voir dire and what the general nature of the case would be").

{¶ 78} Further, a prosecutor is, in general, entitled to "highlight the relative strength of the prosecution's case and relative weakness of the defense." *State v. Smith,* 130 Ohio App.3d 360, 368 (1st Dist.1998). While the prosecutor was, in essence, arguing that the state's evidence would show rape by force and negate a showing of consensual sex, we do not find that the statement purported to shift the burden of proof to appellant, i.e., that the defense had a burden to prove consent.

{¶ 79} Appellant contends the prosecutor continued to exceed the proper boundaries of opening statement by denigrating his defense. Specifically, appellant notes that both the prosecutor and defense made references to the book/movie "50 Shades of Grey," concerning a couple involved in a sadomasochistic sexual relationship. According to appellant, although both sides referenced the story, the prosecutor crossed the line in arguing: "It's a story. [D.E.M.] will tell you a story, not a factual story, but a fantasy, just

like 50 Shades of Grey.  It didn't happen the way he'll testify to because it's a story."  (Tr. Vol. II at 51-52.)

{¶ 80} We note that, as with the first comment addressed above, there was no objection to the prosecutor's reference to a "story," and therefore we review for plain error.  The record indicates that, prior to the challenged reference to a story, the prosecutor had reminded the jurors that defense counsel, during voir dire, had told the jury "that you will hear * * * his side of the story. * * *  He promised you [D.E.M.] is going to get up here and tell you, quote, his side of the story."  (Tr. Vol. II at 51.)  We do not find that the prosecutor's mention of a "story" constituted misconduct, particularly when taken in context as referencing comments made by defense counsel during void dire.  *See State v. Pridgett,* 8th Dist. No. 101823, 2016-Ohio-687, ¶ 40 ("Isolated comments by a prosecutor are not to be taken out of context and be given their most damaging meaning.").

{¶ 81} Appellant next contends the prosecutor committed misconduct during cross-examination of appellant by projecting before the jury an image on the in-court video screen containing a synopsis from a television crime show, Law and Order: Special Victims Unit.  Appellant argues that the synopsis for that particular episode involved a rapist who attempted to get away with his crime by claiming that the rape victim had consensually agreed to participate in bondage and sadomasochistic sex, similar to appellant's defense.  Appellant asserts the prosecutor's referencing of the episode was improper, especially when it involved a rapist fabricating a false defense by claiming the event stemmed from a consensual sadomasochistic sexual relationship.

{¶ 82} In response, the state notes that the prosecutor's questioning of appellant about the television show was prompted by appellant's direct examination testimony stating he was a fan of that particular crime show.  The state contends that the prosecutor was in the process of attempting to refresh appellant's recollection, and that there was a good-faith basis for the inquiry.  The state further maintains there was no evidence of prejudice as the prosecutor displayed the slide for only a few seconds, and the trial court made a specific determination that prejudice was lacking.

{¶ 83} A review of the record indicates that counsel for appellant, during direct examination, asked appellant what the term "SVU" meant to him.  Appellant responded

that it meant "Special Victims Unit," and that he knew the meaning from watching the television series Law and Order: Special Victims Unit.  (Tr. Vol. IV at 507.)  Appellant also stated during direct that he "used to watch [the show] almost weekly."  (Tr. Vol. IV at 507.)

{¶ 84} During cross-examination, the prosecutor questioned appellant about his earlier statement that he was "a big fan of the Special Victims Unit show."  (Tr. Vol. IV at 524.)  Appellant responded that he "used to be" a big fan of the show, and that he was still watching the series in 2012. (Tr. Vol. IV at 524.) Following that response, the following exchange took place between the prosecutor and appellant:

> Q. And that would have been back in 2012; isn't that right?
>
> A. I was still watching it at that time, yes, sir.
>
> Q. Okay. And do you recall Episode 14.3?
>
> A. No, sir, I don't, right offhand.
>
> Q. No? Would this refresh your recollection? An episode
> where a person was —

 (Tr. Vol. IV at 524.)

{¶ 85} At that point in the proceedings, the prosecutor projected an image onto the jury's video screen which, according to appellant, bore a synopsis from a specific episode of Law and Order: Special Victims Unit.  Defense counsel objected, and requested the trial court remove the image on the basis that he had "never seen this document. I don't think there's any foundation for that document [the prosecutor] just published to the jury."  (Tr. Vol. IV at 525.)

{¶ 86} The trial court, while noting that appellant indicated "he's familiar" with the television show, observed that the prosecutor "should have asked" if he recalled a certain episode "before publishing."  (Tr. Vol. IV at 526.)  The trial court agreed with defense counsel that the image "shouldn't have gone up on the screen."  (Tr. Vol. IV at 527.)  The court further noted on the record: "No one has really got a chance to see what it is so I don't think there's prejudice yet."  (Tr. Vol. IV at 527.)

{¶ 87} The prosecutor then addressed defense counsel's objection, stating: "He indicated he watches the show; he's familiar with it.  My intent was to ask him if he knows

about that episode."  (Tr. Vol. IV at 528.)  The prosecutor further stated: "I should have asked if I showed him a synopsis, if that would refresh his recollection, and I did not.  At that point in time, I displayed it for a few brief seconds, * * * to which there was an objection, and unplugged the computer."  (Tr. Vol. IV at 528.)

{¶ 88} Defense counsel argued, however, that "[t]he jury has seen this.  I don't know if that bell can be unrung."  (Tr. Vol. IV at 531.)  Counsel then requested a mistrial.  At that point, the trial court asked defense counsel to address the issue of prejudice; counsel responded that the defense's theory was that appellant and N.C. had discussed bondage in the context of helping appellant's erectile dysfunction, and that the jury would now be left with the impression that appellant "got the idea somewhere else."  (Tr. Vol. IV at 532.)

{¶ 89} The trial court denied the motion for mistrial, ruling: "I don't think you've demonstrated the prejudice here."  (Tr. Vol. IV at 534.)  The court then gave the jury the following instruction:  "Ladies and gentlemen, something was shown to you that was not marked as evidence.  It's not an exhibit. You're to disregard whatever was on that screen.  Is that understood?"  (Tr. Vol. IV at 534-35.)  The jury responded affirmatively to the admonition.

{¶ 90} Following the trial court's instruction to the jury, the prosecutor resumed cross-examination of appellant, including the following exchange:

Q. [The prosecutor]: [D.E.M.], we left off with -- to summarize, you did used to watch a lot of Special Victims Unit; is that right?

A. Yes.

Q. And you had watched it in 2012; isn't that right?

A. I had watched some of them, yes.

Q. Did you ever see an episode involving allegations of a rape where a defendant claimed it was consensual bondage?

A. I can't be sure.

Q. All right. If you were to look at a synopsis of that episode, could that refresh your memory if you had seen it or not, if you read about it?

A. It might.

* * *

Q.  Take a moment to read that.  If you need me to, I can scroll down, [D.E.M.].

A. It's not ringing a bell.

Q. Okay. Thank you.

No further questions.

(Tr. Vol. IV at 535-36.)

{¶ 91} As reflected above, the trial court, while agreeing with defense counsel that the prosecutor should not have displayed the screen shot absent a proper foundation, ultimately found no prejudice under the circumstances.  On review, we agree.

{¶ 92} The initial reference to the television show at issue (Law and Order: Special Victim's Unit) occurred during direct examination, when appellant indicated he had been a fan of the show.  Appellant testified that one of the reasons he did not tell detectives the truth about the incident during his interview at Columbus Police Headquarters was out of concern that his wife would be viewing the interview from another room.  Specifically, during direct examination, the following exchange took place between appellant and his counsel:

Q. Did you give a statement that day?

A. Yes, sir. I started a statement that day.

Q. Did you tell them the truth?

A. No, sir, I didn't.

Q. Why didn't you tell them the truth?

A. I was anxious after riding up there with my wife.  She was asking me -- and I couldn't even tell her the whole situation as far as the affair with her niece. Now I've got somebody else asking me the same questions, and my wife is outside somewhere.

> And like I said, I've watched SVU. When they interview people, a lot of times, somebody is outside watching. I thought my wife would be able to see what was being said, and I wasn't going to throw all the dirty details about the affair out to them in front of her.
>
> I wanted to tell her all the dirty little details. I wanted her to hear it from me because she at least had earned that.

 (Tr. Vol. IV at 513.)

{¶ 93} In light of the record, the prosecutor arguably had a good-faith basis for inquiring about appellant's claim that he was a fan of the television program Law and Order: Special Victim's Unit, and we note that the trial court found the topic of appellant's familiarity with the show to be a proper subject for cross-examination; the trial court further observed, however, at the time the synopsis of an episode of the show was displayed on the screen, the prosecutor had not established a proper foundation to refresh appellant's recollection. The trial court admonished the prosecutor for displaying the image, but found no prejudice as "[n]o one has really got a chance to see what it is." (Tr. Vol. IV at 527.)

{¶ 94} On review, even if appellant could show improper conduct by the prosecutor, we agree with the trial court's determination that appellant cannot demonstrate resulting prejudice from the record. Here, the transcript of proceedings does not suggest the image was displayed for more than a few seconds before the prosecutor turned off the projector. Further, the trial court instructed the jury to disregard "whatever was on that screen." (Tr. Vol. IV at 535.) Under Ohio law, "[a] trial jury is presumed to follow the instructions given to it by the judge." *State v. Henderson,* 39 Ohio St.3d 24, 33 (1988). We presume, therefore, that the jury followed the trial court's admonition. Further, having found no prejudice, we also conclude that the trial court did not, as asserted by appellant under his third assignment of error, err in failing to grant appellant's motion for mistrial following the display of the synopsis.

{¶ 95} Appellant also contends the prosecutor engaged in misconduct during closing argument by commenting on his failure to produce certain records in his own defense. Specifically, appellant cites comments by the prosecutor that appellant would have had "access to his own phone accounts, his own phone records," and that appellant

"knew his own phone would have contained evidence or records about what happened." (Tr. Vol. V at 636.) Appellant also challenges the prosecutor's statement that appellant had access to his own phone records "at the time the detective interviewed him, when, according to his own attorney, quote, the gig was up." (Tr. Vol. V at 636.)

{¶ 96} Appellant argues that defense counsel objected on the basis of shifting the burden, as well as the comment about his own attorney saying "the gig was up." Appellant notes that the trial court cautioned the prosecutor, who was then permitted to continue his closing. Appellant maintains the comment was improper and criticized him for failing to produce evidence, a burden he did not have.

{¶ 97} The state argues that the defense opened the door to the prosecutor's rebuttal argument regarding the phone records by repeatedly impugning the thoroughness of the investigation during cross-examination of Detective Cameron; further, the state contends, counsel for appellant returned to this theme during closing argument, claiming that the detective had not obtained the phone records himself, and touting that the defense had to get the records for trial. The state maintains that the prosecutor was seeking to address defense counsel's theme that the police failed to properly investigate the case and that Detective Cameron had "tunnel vision," i.e., that the detective was representing the alleged victim instead of the truth. The state further notes that the prosecutor, during closing argument, made clear that "defense counsel is right. He does not have to produce anything. It's not the defendant's job to prove anything in the case. It's the State's burden * * * to show, in fact, a rape occurred." (Tr. Vol. V at 631-32.)

{¶ 98} The record supports the state's claim that the prosecutor's comments during rebuttal closing argument were made in response to arguments by defense counsel regarding the thoroughness of the police investigation. During closing, defense counsel argued that Detective Cameron "had every access to those telephone records," but "he didn't want them." (Tr. Vol. V at 606.) Counsel argued that the detective "didn't need to go get phone records or text records because [he] believed [N.C.]." (Tr. Vol. V at 607.) Defense counsel challenged any criticism "for not having all the phone records when we're the ones that had to get them." (Tr. Vol. V at 603.) Counsel further argued: "This is what

false convictions are made of when people don't bother to get phone records and then criticize the defense for not getting enough."  (Tr. Vol. V at 629.)

{¶ 99} On rebuttal, the prosecutor argued in part: "And so to stand up here and ask, 'Well, where's the evidence?'  [D.E.M.] put out those items of evidence for you to consider, but he's also in control of those items of evidence; and we don't have any of them."  (Tr. Vol. V at 635.)  The prosecutor further stated: "[D.E.M.] would have had access to his own phone accounts, his own phone records."  (Tr. Vol. V at 636.)

{¶ 100} In general, a prosecutor "may comment upon the failure of the defense to offer evidence in support of its case." *State v. Peeples,* 7th Dist. No. 07 MA 212, 2009-Ohio-1198, ¶ 88.  Further, such comments "do not imply that the burden of proof has shifted to the defense." *Id.*

{¶ 101} Under the facts of *Peeples,* the prosecutor made a comment, similar to the one challenged in the instant case, that if defense counsel wanted phone records, "[s]he could have brought them in court to you." *Id.* at ¶ 86.  The reviewing court in that case rejected the argument that the comments improperly shifted the burden to the defense. *Id.* at ¶ 88.  *See also State v. Baldwin,* 8th Dist. No. 94876, 2011-Ohio-1066, ¶ 25-26 (prosecutor's statement that "defense has every bit as much ability to go out and get evidence [and] subpoena phone records," made in response to defense claim that police acted erroneously in failing to obtain phone records, did not improperly shift burden of proof to defense).  Here, the trial court found, and we agree, there was no improper burden shifting.

{¶ 102} Based on the foregoing, appellant's second and third assignments of error are not well-taken and are overruled.

{¶ 103} Appellant's fourth and fifth assignments of error are interrelated and we will consider them together.  Under these assignments of error, appellant challenges his convictions as not supported by sufficient evidence and as against the manifest weight of the evidence.

{¶ 104} In *State v. Martin,* 10th Dist. No. 14AP-189, 2014-Ohio-4447, ¶ 19-20, this court discussed the distinction between sufficiency and manifest weight claims as follows:

> In reviewing the "record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found

> the essential elements of the crime proven beyond a reasonable doubt.' "
>
> In contrast to a sufficiency argument, a reviewing court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact." Rather, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

(Citations omitted.)

{¶ 105} Appellant's arguments primarily focus on the weight of the evidence and the credibility of N.C., the alleged victim. Appellant contends the evidence presented was consistent with his testimony portraying a consensual affair with N.C. and that, by contrast, the version of events provided by N.C. was not believable and defies common sense.

{¶ 106} We first consider appellant's challenge to the sufficiency of the evidence. As noted, appellant was convicted of rape, in violation of R.C. 2907.02, and kidnapping, in violation of R.C. 2905.01. The elements of rape under R.C. 2907.02 are "engaging in sexual conduct with another when the offender purposely compels the other by force or threat of force." *State v. Rupp,* 7th Dist. No. 05 MA 166, 2007-Ohio-1561, ¶ 48, citing R.C. 2907.02(A)(2). Force is defined under R.C. 2901.01(A)(1) to mean "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

{¶ 107} R.C. 2905.01(A) defines the offense of kidnapping in part as follows:

> No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (3) To terrorize, or to inflict serious physical harm on the victim or another;

> **(4)** To engage in sexual activity, as defined in section 2907.01
> of the Revised Code, with the victim against the victim's will[.]

{¶ 108} In the present case, the state presented the testimony of N.C., who stated that appellant, beginning in 2012, made comments and sent communications to her, including via text images and letters, containing sexual innuendos; further, appellant attempted to solicit sexual favors from N.C. for money. N.C. stated that she had strict rules against engaging in relations with married men, and that she communicated that fact to appellant.

{¶ 109} On February 6, 2013, appellant texted N.C. and informed her that he would be arriving at her residence, and he hoped she would greet him "in nothing but a towel." (Tr. Vol. II at 94.) When appellant arrived, he was wearing camouflage clothing and carrying a backpack and a case of beer. Appellant and N.C. sat in the kitchen drinking beer for approximately one hour, at which time N.C. got up to go to the bathroom. A short time later, as N.C. emerged from the bathroom, appellant spun her around and tied her hands behind her back. Appellant then took a bandana and gagged her mouth; he threw her over his shoulder and carried her into the bedroom, dropping her onto the bed. N.C. repeatedly spit out the gag and screamed for him to stop, but he shoved the gag back into her mouth. As N.C. was on the bed with her hands tied behind her back, appellant pinned her down, pulled down her sweatpants and leggings, and "raped [her] with his penis." (Tr. Vol. II at 128.) N.C. testified that she felt his penis "[i]n my vagina." (Tr. Vol. II at 130.) Following the events, appellant quickly left her apartment. N.C. stated she did not consent to appellant's acts.

{¶ 110} N.C. immediately called for help, and she was taken to a hospital where she underwent a rape kit examination. N.C. related the events to the nurse examiner, who created a report and took photographs of N.C., which revealed bruising to various areas of her body, as well as redness and swelling around her mouth and tongue area. A detective who spoke with N.C. at the hospital shortly after the incident described her demeanor as "[f]rantic" and "extremely emotional." (Tr. Vol. III at 275.) The investigative detective eventually conducted three interviews with N.C., and N.C. provided the detective the same version of the incident during each interview. Detectives also interviewed appellant about

the alleged incident; at trial, appellant acknowledged lying to detectives about details of the events.

{¶ 111} Under Ohio law, "a rape victim's testimony alone, if believed, is enough evidence for a conviction." *State v. Fortson,* 8th Dist. No. 92337, 2010-Ohio-2336, ¶ 47. *See also State v. Johnson,* 8th Dist. No. 91900, 2009-Ohio-4367, ¶ 53, citing *State v. Hanni*, 8th Dist. No. 91014, 2009-Ohio-139, ¶ 22 ("a rape victim's testimony can be sufficient to support a conviction even where there is no corroborating physical evidence").

{¶ 112} Here, in addition to N.C.'s testimony that appellant forced her to submit to vaginal intercourse against her will, the state presented other evidence, including DNA testing and the testimony of the nurse examiner, consistent with N.C.'s account. As indicated, the nurse examiner took photographs depicting bruising on N.C., as well as swelling and redness to her mouth and tongue area consistent with N.C.'s testimony that appellant repeatedly forced a gag in her mouth. Construing the evidence most strongly in favor of the state, as we are required to do in considering a sufficiency challenge, the state presented sufficient evidence to prove the elements of kidnapping and rape beyond a reasonable doubt.

{¶ 113} As noted, appellant's primary contention is that the testimony of N.C. was not credible, and that such testimony was marked by inconsistencies. In asserting that N.C.'s version was not credible, appellant cites evidence that: (1) appellant discussed his marital problems with N.C., and she was aware he wanted a sexual relationship with her; (2) N.C. acknowledged once greeting appellant at the door while wearing only a towel; (3) N.C. engaged in a one-hour long conversation with appellant as he sat naked in her living room, thereby casting doubt on her claim she was trying to deter his advances; (4) N.C. failed to turn over her cell phone to detectives, providing only selective text messages; and (5) N.C. gave inconsistent testimony regarding two blue bandanas introduced at trial.

{¶ 114} We note that the defense raised many of the above issues during cross-examination of N.C. Specifically, defense counsel questioned N.C. about discussions she had with appellant regarding lack of intimacy in his marriage. N.C. also acknowledged once answering the door while wearing a towel, but she denied ever exhibiting her body to

appellant. N.C. further acknowledged that appellant, during one of his visits, went into the bathroom and later emerged naked; appellant then sat in the dining room area for approximately one hour. N.C. testified that she "told him he needed to leave, and I told him he needed to go put his clothes back on." (Tr. Vol. III at 162.) N.C. stated that, after she told him to go back inside the bathroom and put his clothing on, appellant "was hostile. He was resistant. He sat back down. He broke down. He cried. He sobbed." (Tr. Vol. III at 163.) N.C. explained that she found his actions to be disturbing, "but at the same time, he was family. I thought, okay, you're going through a mental breakdown. You're having a problem." (Tr. Vol. III at 163.)

{¶ 115} Defense counsel also questioned N.C. about text messages and letters appellant had sent containing sexual innuendos. N.C. stated that she told appellant "no. I told him I wasn't interested. I told him he needed to work on his marriage. I told him to get therapy. I told him to get help." (Tr. Vol. III at 168.)

{¶ 116} Defense counsel also sought to impeach N.C. with inconsistencies regarding her trial testimony and information she provided detectives, including statements as to whether appellant had, prior to the incident, brought a bandana to her residence. Defense counsel also questioned N.C. as to whether she told detectives she could not recall how or where appellant tied her up. N.C. responded: "What I told them was it happened very quickly. I came out of the restroom. I was turned around, tied, gagged, and over his shoulder * * * very quickly." (Tr. Vol. III at 192.)

{¶ 117} While the record reveals some inconsistencies in N.C.'s testimony, the jury was free to resolve those inconsistencies in favor of the state's witness. The jury was also able to observe the demeanor of appellant and assess his credibility. As noted, appellant acknowledged that he lied to detectives about engaging in sex with N.C., tying up and gagging her, and writing letters to her. Appellant also told detectives that he penetrated N.C.'s vagina about an inch or two, while he testified at trial that he prematurely ejaculated and never penetrated her vagina.

{¶ 118} Accepting that there were some inconsistencies in N.C.'s testimony, " 'a conviction is not against the manifest weight of the evidence merely because the trier of fact may have heard inconsistent testimony.' " *State v. Jackson,* 10th Dist. No. 02AP-468, 2003-Ohio-1653, ¶ 48, quoting *State v. Crawley,* 10th Dist. No. 01AP-532 (Mar. 12,

2002).  As we noted in addressing appellant's sufficiency argument, in addition to the testimony of N.C., the state presented other corroborating evidence, including the testimony of the nurse examiner who noted a number of bruises on N.C., as well as redness and swelling to her mouth and tongue area.  The jury also heard testimony from both the nurse examiner and the detective regarding N.C.'s demeanor following the events.

{¶ 119} Here, the trier of fact could have reasonably concluded that the testimony of N.C., as well as the other evidence submitted, was consistent with the state's theory of force and that the incident did not involve a consensual sexual encounter.  Further, we are unable to find that the jury, in making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.  Accordingly, we are not persuaded by appellant's claim that his convictions are against the manifest weight of the evidence.

{¶ 120} Based on the foregoing, appellant's fourth and fifth assignments of error are without merit and are overruled.

{¶ 121} Under his sixth assignment of error, appellant contends the trial court erred in admitting hearsay evidence. Specifically, appellant argues that, over the objection of defense counsel, the trial court permitted the prosecutor to elicit several hearsay statements from Detective Cameron, including the statement that N.C. never indicated she engaged in consensual conduct with appellant, and that N.C. told the detective the gag had been placed in her mouth three times.  Appellant also argues that the detective repeated a statement made by N.C. regarding a second bandana, i.e., that she would not have washed the bandana if it had been used in the offense.   Appellant argues that these hearsay statements served to bolster the credibility of N.C., and that the admissions of these statements was prejudicial.

{¶ 122} In response, the state argues that defense counsel sought to impugn the thoroughness of the police investigation, and that the challenged statements were properly admissible for the non-hearsay purpose of showing what evidence the detective had gathered, and to explain why it was reasonable for the detective to stop the investigation and not engage in further steps.  The state further argues that the admission of these statements was harmless because the evidence was duplicative of what the jury already heard during the testimony of N.C.

{¶ 123} A review of the record indicates that, during cross-examination of Detective Cameron, defense counsel questioned the detective about his investigation, including the fact he had not obtained all of N.C.'s cell phone records. Counsel also asked the detective whether N.C. "said that it was all one-sided," and that "she didn't want anything to do with the sexual part." (Tr. Vol. III at 324.) Further, defense counsel questioned the detective whether N.C. had brought a blue bandana to one of the police interviews; finally, defense counsel inquired whether N.C. had ever related a discussion she had with appellant about a bondage fantasy, and whether appellant had shown N.C. a bandana prior to the events of February 6, 2013.

{¶ 124} On redirect examination, the prosecutor asked the detective whether N.C., during any of the investigative interviews, "ever indicate[d] she had engaged in consensual sexual conduct" with appellant. (Tr. Vol. IV at 372.) The prosecutor also asked the detective "how many times [N.C.] told you the gag was in her mouth?" (Tr. Vol. IV at 373.) Defense counsel objected to both inquiries. During sidebar, defense counsel argued that "[t]hese are essentially hearsay responses designed to bolster her credibility." (Tr. Vol. IV at 374.) In response, the prosecutor argued that the inquiries were appropriate topics for redirect examination because counsel for appellant had questioned the detective "about the gags. He asked about different bandanas." (Tr. Vol. IV at 374.) The trial court overruled the objections.

{¶ 125} In general, "[u]nder the hearsay rules, the prior consistent statement of a testifying witness is not admissible to directly bolster that witness's credibility. But a prior consistent statement can be used to rebut a charge 'of recent fabrication or improper influence or motive.' " *State v. Trusty,* 1st Dist. No. C-120378, 2013-Ohio-3548, ¶ 47, citing Evid.R. 801(D)(1)(b). In order for a statement to qualify under this exception to the hearsay rules, "the witness must have made the consistent statement before the alleged fabrication, influence or motive occurred." *Id.* Further, under Ohio law, "the erroneous admission or exclusion of hearsay, cumulative to properly admitted testimony, constitutes harmless error." *State v. Hogg,* 10th Dist. No. 11AP-50, 2011-Ohio-6454, ¶ 46.

{¶ 126} Here, even accepting that the statements constituted hearsay, any error was harmless. As noted by the state, statements by the detective that N.C. never indicated she had a consensual relationship with appellant, and that appellant placed the gag in her

mouth three times, were duplicative of testimony properly admitted at trial during the testimony of N.C., who was subject to cross-examination as to those issues. *See, e.g., State v. Tucker,* 8th Dist. No. 83419, 2004-Ohio-5380, ¶ 78, quoting *State v. Tomlinson,* 33 Ohio App.3d 278, 281 (12th Dist.1986) (" 'Where a declarant is examined on the same matters as contained in impermissible hearsay statements and where admission is essentially cumulative, such admission is harmless' "); *State v. Nichols,* 85 Ohio App.3d 65, 73 (4th Dist.1993) (where minor child gave detailed account of alleged assault and was subject to cross-examination, improper admission of caseworker's testimony containing prior consistent statements was harmless beyond a reasonable doubt). Accordingly, appellant's sixth assignment of error is not well-taken and is overruled.

{¶ 127} Under the seventh assignment of error, appellant asserts the trial court erred in failing to properly instruct the jury, denying him a meaningful opportunity to present a complete defense. Appellant argues that the practice of bondage within the context of a sexual relationship presents a unique challenge to the law. According to appellant, the standard Ohio Jury Instructions do not adequately address the issue of consent, which should nullify a criminal conviction for kidnapping if the participant desires to be tied up or restrained for sexual relations.

{¶ 128} Appellant contends he attempted to overcome this "inherent bias" in the standard jury instructions by submitting the following proposed instructions:

> CONSENT TO COUNT ONE
>
> The Defendant maintains his innocence by claiming the sexual encounter in this case was consensual. Since consent negates the material element of force, if you find that the State has failed to prove beyond a reasonable doubt that the sexual encounter was by force or threat of force, you must find the Defendant not guilty.
>
> CONSENT TO COUNT TWO
>
> The Defendant maintains his innocence by claiming the sexual encounter in this case was consensual. Since consent negates the material element of force, if you find that the State has failed to prove beyond a reasonable doubt that the restraint was by force or threat of force, you must find the Defendant not guilty.

{¶ 129} Appellant notes that the parties and the trial court engaged in an extensive discussion on how to deal with this issue. Appellant acknowledges that the trial court ultimately accepted part, but not all, of his proposed jury instructions. More specifically, the trial court instructed the jury as appellant requested on count one (the rape charge). However, appellant argues the trial court gave a confusing instruction as to the kidnapping charge under count two by merely cross-referencing the definition of force instruction given in the rape charge.

{¶ 130} Appellant maintains that his proposed jury instruction on count two specifically addressed consent as to the issue of "restraint," as opposed to the instruction for count one which only addressed the issue of consent going to the "sexual encounter." According to appellant, because of these confusing instructions, the jury could have very likely believed that consent eliminated the necessary element of force on the rape charge, but that consent did not negate the force element on the issue of restraint.

{¶ 131} This court reviews a trial court's decision to refuse a requested jury instruction for abuse of discretion. *State v. Lillo,* 6th Dist. No. H-10-001, 2010-Ohio-6221, ¶ 15.

{¶ 132} As observed by appellant, the trial court and the parties had an extensive discussion regarding the proposed instructions. During that discussion, the trial court noted that consent is "not an affirmative defense," and that the defense did not have "any burden to prove anything." (Tr. Vol. V at 548, 549.) Defense counsel agreed with the trial court's statement, but argued: "I would like, at a minimum, language that further defines the element of force then, that would say if it is consensual, it negates the element of force." (Tr. Vol. V at 549.) The trial court expressed concern with "trying to figure out how to deal with" defense counsel's proposed language without putting "the burden upon the defense." (Tr. Vol. V at 550.) The trial court ultimately agreed to defense counsel's proposed language with respect to the rape count; as to the definition of force under count two, the court indicated that, in order "to address the issue as fairly as I can," the jury would be instructed that " 'I have defined the concept of force for you,' and leave it at that." (Tr. Vol. V at 582.) The trial court further stated to counsel for both sides: "The ammunition is there for both sides to argue it accordingly. I think it's a fair representation of the law." (Tr. Vol. V at 582.)

{¶ 133} The trial court subsequently provided the jury the following instruction regarding the rape offense element of force:

> Force means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing.
>
> The defendant maintains his innocence by claiming the sexual conduct in this case was consensual. Since consent negates the material element of force, if you find that the State has failed to prove beyond a reasonable doubt that the sexual conduct was by force or threat of force, you must find the defendant not guilty.

(Tr. Vol. V at 647.)

{¶ 134} With respect to count two (kidnapping), the trial court instructed the jury: "I have defined the concept of force for you."  (Tr. Vol. V at 648.)

{¶ 135} Under Ohio law, " 'a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *State v. Frazier,* 9th Dist. No. 25338, 2011-Ohio-3189, ¶ 17, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus.  Further, " '[a] defendant is entitled to have his instructions included in the charge to the jury only when they are a correct statement of the law, pertinent and not included in substance in the general charge.' "  *Id.*, quoting *State v. Theuring*, 46 Ohio App.3d 152, 154 (1st Dist.1988).

{¶ 136} In addressing appellant's argument, the state argues that, for purposes of the kidnapping count, the trial court referred the jury back to the "concept of force" it had defined earlier and, based on the earlier instruction given just moments before, the court emphasized that "consent negates the material element of force."  (Tr. Vol. V at 574.) According to the state, appellant cannot show abuse of discretion by the trial court under these circumstances.  We agree.

{¶ 137} As recognized by the trial court during discussions as to the proposed jury instructions, "consent is not an affirmative defense to a charge of rape."  *State v. Keeton,* 5th Dist. No. 03 CA 43, 2004-Ohio-3676, ¶ 109.  We note that Ohio courts have rejected the claim that a separate instruction on consent must be provided where the court defined force under the statutory language, i.e., "any violence, compulsion or constraint physically

exerted by any means upon a person or thing." *State v. Farler,* 2d Dist. No. 12377 (Aug. 28, 1991). In *Farler,* the court found "no need to include a separate instruction on consent because the instruction, as given, adequately covered the consent 'defense' by implication." *Id.* Rather, because the state was required to prove that the defendant compelled the alleged victim to submit to sexual conduct by force or threat of force, such proof "would have, by definition, negated consent." *Id. See also State v. Whitfield,* 11th Dist. No. 9-283 (Mar. 30, 1984) (although trial court did not incorporate the defendant's requested instruction on "consent" verbatim into its general charge, "the court's instruction as to the use of force or threat of force certainly informed the jury compulsion was necessary for a conviction of rape and indirectly informed the jury that, if there was consent, there could be no rape").

{¶ 138} In the instant case, the trial court gave an instruction on consent/force as requested by defense counsel with respect to the rape charge, i.e., that "consent negates the material element of force." While the court referred back to that earlier instruction in defining force as related to the kidnapping count, we find no error by the trial court. Here, taken as a whole, the instructions adequately set forth the law and "included the substance of the requested instruction." *Farler.*

{¶ 139} Accordingly, appellant's seventh assignment of error is overruled.

{¶ 140} Under his eighth assignment of error, appellant contends the trial court erred in failing to merge the offenses of kidnapping and rape for purposes of sentencing. Appellant argues that the restraint or movement of the victim for purposes of the kidnapping offense was only incidental to the underlying rape offense, and that there was only a single animus shown.

{¶ 141} R.C. 2941.25 states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the

indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 142} This court has recognized that "in some circumstances, it is possible to commit the offenses of rape and kidnapping with the same conduct." *State v. Vargas,* 10th Dist. No. 12AP-692, 2014-Ohio-843, ¶ 22.

{¶ 143} In *State v. Logan,* 60 Ohio St.2d 126 (1979), syllabus, the Supreme Court of Ohio held:

> In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:
>
> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
>
> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

{¶ 144} In the present case, the state argues that a separate animus exists for the kidnapping because appellant's restraint of N.C. was prolonged, secretive, and involved extreme restraints; the state further contends that the conduct at issue subjected her to a substantial increase in risk of harm separate and apart from the rape such that there was an independent existence for the kidnapping and rape.

{¶ 145} Based on the facts of this case, we agree with the state's argument that a separate animus existed for the kidnapping and rape. Ohio courts have determined that a separate animus exists when the type of restraint used places the victim at risk of physical harm. *See State v. Toy,* 12th Dist. No. CA2009-04-116, 2010-Ohio-1098, ¶ 15 (makeshift handcuffs not only facilitated rape but also substantially increased victim's danger of asphyxiation when she was unable to defend herself while appellant placed a rag over her

face; further, the zip ties created deep "ligature marks" on victim's wrists, indicating additional injury separate from the injury caused by the rape).  *See also State v. Carter,* 12th Dist. No. CA2002-02-012, 2002-Ohio-6108, ¶ 42 (restraint of victim subjected her to substantial risk of harm separate from underlying rape where defendant bound victim with handcuffs, which not only facilitated rape, but also substantially increased the danger of asphyxiation since she was hindered from moving her arms and hands to remove first the latex glove and then sock which appellant placed in her mouth before taping it shut); *State v. Haynes,* 10th Dist. No. 01AP-430, 2002-Ohio-4389, ¶ 114 (separate animus existed for crimes of rape and kidnapping where restraint of victim subjected her to a substantial increase and risk of harm separate and apart from the underlying rape; victim was bound hand and foot, probably with an electrical cord, which not only facilitated rape but substantially increased the danger of asphyxiation since she was not able to defend herself or even move her arms or otherwise reposition herself and avoid dangerous compression upon her neck).  It has also been held that "covering a victim's mouth to avoid yelling is a step further than holding one in place in order to consummate the act of rape," and such act "is done to avoid detection, as opposed to being done in order to facilitate the physical act."  *State v. Taylor,* 7th Dist. No. 07 MA 115, 2009-Ohio-3334, ¶ 32.

{¶ 146} In the present case, prior to engaging in sexual conduct with N.C., appellant grabbed her in the hallway, spun her around and placed restraints on her, tying her hands behind her back; appellant also placed a gag in her mouth.  He then lifted N.C. and placed her over his shoulder, carrying her to the bedroom.  N.C. attempted to spit out the gag three times, but appellant forced the gag back inside her mouth.  The state introduced photographs of N.C. taken at the hospital indicating bruising to various areas of her body, as well as redness and swelling to her mouth and tongue area.  Here, the evidence indicates that appellant's restraint of N.C. subjected her to "substantial increase in risk of harm separate and apart from the rape."  *Logan* at syllabus.  Thus, because a separate animus existed for each offense, the trial court did not err in sentencing appellant on the rape and kidnapping convictions.

{¶ 147} Appellant's eighth assignment of error is overruled.

{¶ 148} Under his ninth assignment of error, appellant contends the trial court erred in imposing a ten-year prison sentence. Appellant argues that the sentence was excessive in light of the fact he was a first-time offender, with low risk of recidivism.

{¶ 149} R.C. 2953.08(G)(2) states as follows:

> The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
>
> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

{¶ 150} Pursuant to the above statute, "an appellate court does not review the sentencing court's decision for an abuse of discretion." *State v. Julious,* 12th Dist. No. CA2015-12-224, 2016-Ohio-4822, ¶ 8, citing *State v. Marcum,* _____ Ohio St.3d ____, 2016-Ohio-1002, ¶ 10. Rather, the language of R.C. 2953.08(G)(2) "compels an appellate court to modify or vacate a sentence only if the appellate court finds by clear and convincing evidence that 'the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law.' " *Id.,* quoting *Marcum* at ¶ 1. Further, "[a] sentence is not clearly and convincingly contrary to law where [the] trial court 'considers the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range.' " *Id.,* quoting *State v. Ahlers,* 12th Dist. No. CA2015-06-100, 2016-Ohio-2890, ¶ 8.

{¶ 151} During the sentencing hearing in this case, the trial court stated in part:

> I've been thinking about this sentence since the verdict. My biggest problem with the scenario here is the predatory nature in the way this went down. Quite frankly, after hearing the physical evidence, I didn't believe anything you said, and that was basically what the jurors said too.
>
> You've not had a bad record. It's not the worst-case scenario. Unfortunately, I do see worse than this. But it has torn the family apart.

(Tr. Vol. V at 678.)

{¶ 152} In the present case, appellant was convicted of rape and kidnapping, felonies of the first degree. Pursuant to R.C. 2929.14(A)(1), a prison term for a felony of the first degree shall be "three, four, five, six, seven, eight, nine, ten, or eleven years." The trial court sentenced appellant to ten years each on the rape and kidnapping charges, with the sentences to run concurrent to each other. Thus, the individual sentences were within the statutory range. Further, the trial court's sentencing entry states that it considered the purposes and principles of sentencing set forth in R.C. 2929.11, as well as the factors set forth in R.C. 2929.12. While the trial court noted that appellant had "not had a bad record," and that "[i]t's not the worst-case scenario," the court found "the predatory nature" of the crime, as well as the fact "it has torn the family apart," as supporting a sentence on the higher end. (Tr. Vol. V at 678.)

{¶ 153} Based on this court's review of the record, we cannot clearly and convincingly find that the record does not support the trial court's findings under the relevant statutes, or that the sentence is otherwise contrary to law. Accordingly, appellant's ninth assignment of error is overruled.

{¶ 154} Under his tenth assignment of error, appellant asserts he was denied the right to effective assistance of counsel. Specifically, appellant argues that his counsel was ineffective in failing to seek N.C.'s mental health records prior to the date of trial.

{¶ 155} It is well-settled that "[t]he two-prong test for ineffective assistance of counsel requires a defendant to prove (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant." *State v. Yahya,* 10th Dist. No. 10AP-1190, 2011-Ohio-6090, ¶ 7, citing *Strickland v. Washington*, 466 U.S. 668, 687

(1984). In order to "show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraph three of the syllabus.

{¶ 156} In addressing appellant's first assignment of error, we noted a lack of evidence that N.C. suffered from a mental impairment at the time of the incident, and that there was no indication any purported mental health records of N.C., if they existed, would have been admissible or that they would have contained impeaching evidence. The record on appeal fails to show that the admission of such records would have changed the outcome of the trial, and appellant has demonstrated neither deficient performance nor prejudice.

{¶ 157} Appellant's tenth assignment of error is overruled.

{¶ 158} Under his eleventh assignment of error, appellant raises a cumulative error argument. Appellant asserts a general claim that, even if this court finds any error in his individual assignments of error to be harmless, the cumulative effect of these errors caused prejudicial error requiring reversal.

{¶ 159} Under Ohio law, "[c]umulative error may only be found when the effect of multiple errors, individually found to be harmless, acts to deprive the defendant of his constitutional right to a fair trial." *State v. Clay,* 7th Dist. No. 08 MA 2, 2009-Ohio-1204, ¶ 188, citing *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). *See also State v. Lanler,* 7th Dist. No. 09 MA 97, 2010-Ohio-6382, ¶ 108 ("Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal."). The doctrine of cumulative error, however, is inapplicable when there are not "multiple instances of harmless error or the alleged errors are nonexistent." *Id.,* citing *State v. Jones*, 7th Dist. No. 08 JE 20, 2010-Ohio-2704, ¶ 130.

{¶ 160} In the instant case, appellant has not demonstrated multiple instances of harmless error, the cumulative effect of which deprived him of a fair trial.

{¶ 161} Accordingly, appellant's eleventh assignment of error is overruled.

{¶ 162} Based on the foregoing, appellant's eleven assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

TYACK and SADLER, JJ., concur.

————————————————